2013-1630

# 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals
## for the 𝔉ederal 𝔆ircuit

SENJU PHARMACEUTICAL CO., LTD., KYORIN PHARMACEUTICAL CO., LTD.
AND ALLERGAN, INC.,

*Plaintiffs-Appellants*,

v.

LUPIN LIMITED AND LUPIN PHARMACEUTICALS, INC.,

*Defendants-Appellees,*

and

HI-TECH PHARMACAL CO., INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the District of Delaware in
consolidated case no. 11-CV-0271, Judge Sue L. Robinson

## BRIEF OF DEFENDANTS-APPELLEES LUPIN LIMITED
## AND LUPIN PHARMACEUTICALS, INC.

————

William A. Rakoczy
Paul J. Molino
Deanne M. Mazzochi
Anuj K. Wadhwa
John D. Polivick
Brian P. Murray
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
Telephone: 312-527-2157

*Counsel for Defendants-Appellees Lupin Limited and Lupin Pharmaceuticals, Inc.*

Dated: January 27, 2014

# <u>CERTIFICATE OF INTEREST FOR LUPIN LIMITED AND LUPIN PHARMACEUTICALS, INC.</u>

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4, counsel for Defendants-Appellees Lupin Limited and Lupin Pharmaceuticals, Inc. certifies the following:

1.     The full name of every party represented by me is:

Lupin Limited and Lupin Pharmaceuticals, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not Applicable.

3.     All parent corporations and any publically-held companies that own 10% or more of the stock of any party represented by me are:

Lupin Pharmaceuticals, Inc. is a wholly-owned subsidiary of Lupin

Limited.

4.     The names of all law firms and the partners or associates that have appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:

William A. Rakoczy
Paul J. Molino
Deanne M. Mazzochi
Anuj K. Wadhwa
John D. Polivick
Brian P. Murray
Tara M. Raghavan
Neil A. Benchell*
Harven V. DeShield
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654

*No longer affiliated with the firm.

John C. Phillips, Jr.
Megan C. Haney
PHILLIPS, GOLDMAN &SPENCE, P.A.
1200 North Broom Street
Wilmington, Delaware 19806

Dated: January 27, 2014        RAKOCZY MOLINO MAZZOCHI SIWIK LLP

/s/Deanne M. Mazzochi
Deanne M. Mazzochi
William A. Rakoczy
Paul J. Molino
Anuj K. Wadhwa
John D. Polivick
Brian P. Murray
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 527-2157

*Attorneys for Defendants-Appellants*
*Lupin Limited and Lupin Pharmaceuticals, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... vii

LIST OF ABBREVIATIONS ................................................................... xiii

I.     STATEMENT OF RELATED CASES ...........................................1

II.    STATEMENT OF ISSUES .............................................................3

III.   STATEMENT OF THE CASE .......................................................6

     A.    Background to the technology, scope and content of the prior art. ...................................................................................................7

          1.    Ophthalmic drug formulations. ..................................................7

          2.    The prior art. ..............................................................................8

               a.    Gatifloxacin and the fluoroquinolone drug class. ...........8

               b.    The calcium-chelator EDTA: general properties. ..........10

          3.    EDTA was a known corneal permeability enhancer. ..............10

               a.    The Grass papers ............................................................10

               b.    Other references. ............................................................15

     B.    The '045 patent. ......................................................................19

          1.    The original patent application and claims. ..............................19

          2.    The reexamination application and claims. ..............................21

     C.    The theories presented to the PTO during reexamination collapse before the district court. ..........................................22

     D.    Intervening rights, collateral estoppel, noninfringement. ...................25

IV.   SUMMARY OF THE ARGUMENT ...........................................28

V.    ARGUMENT ............................................................................... 31

    A.    The district court correctly found the asserted claims obvious ........... 31

        1.    The district court applied the correct legal standards. .............. 31

        2.    *Graham* factors 1 and 2:  there was no dispute Lupin's cited references were prior art; nor was the level of ordinary skill in the art material to the outcome. ...................... 32

        3.    *Graham* factors 3 and 4:  the district court identified potential differences between the art and the claims; recognized the importance of the 0.01 w/v% EDTA claim element added during reexamination; and only found obviousness *after* considering Appellants' so-called "secondary considerations" theories. ........................................ 33

            a.    Composition claims 12-16 .............................................. 35

                i.    There are no differences between composition claims 12-16 and prior art combinations that substitute gatifloxacin into existing fluoroquinolone eye drops .............. 35

                ii.    The district court's findings. ............................... 36

                iii.    Appellants show neither legal nor factual error in the district court's composition claims analysis ...................................................... 38

                    (A).    Time alone is irrelevant. ............................ 38

                    (B).    Corneal permeability is not outcome-determinative for claims 12-16. ................ 38

            b.    There are no differences between method/process claim 6 given prior art EDTA teachings ........................ 41

                i.    Using EDTA to influence corneal permeability was known ....................................... 42

   ii. The district court found the prior art tested 0.01 w/v% EDTA to produce corneal permeability increases; Appellants fail to show that finding was clearly erroneous. .............43

    (A). Grass 1988 I and II; Rojanasakul ..............43

    (B). The district court considered Kompella and Mitra; neither reference "teaches away" from 0.01 w/v% EDTA. ......................................................45

     (1). Kompella never teaches away. ........46

     (2). Mitra does not teach away. ..............47

    (C). The district court properly relied on Rojanasakul. ...............................................49

    (D). The district court rightly disregarded Appellants' untimely size-dependent theory. .......................................................50

  c. The district court correctly found Appellants' "unexpected results" evidence unpersuasive before reaching the ultimate conclusion on obviousness. .........53

   i. Senju's results were not statistically significant; reported numerical increases were unsurprising after Grass 1988 I. ..................54

   ii. The district court correctly found the magnitude of increase was unpersuasive. ............57

B. Alternative grounds for affirmance. ....................................61

 1. In Hatch-Waxman cases, the ANDA product and label is paramount. ..................................................................61

  a. The district court's claim 6 direct infringement analysis employed an "analogous product" claim comparison. ....................................................62

b.     The district court improperly skipped the claim 6
inducement-to-infringe analysis. .....................................63

2.     Under Appellants' logic, the asserted claims are invalid
under 35 U.S.C. § 112...............................................................65

     a.     The '045 patent nowhere states 0.01 w/v% EDTA
increases corneal permeability.......................................65

     b.     Appellants cannot denigrate the prior art teachings
without invalidating their own patent.............................66

         i.     There is no written description support for
the 0.01 w/v% EDTA in a corneal
permeability method............................................67

         ii.     The '045 patent does not even hypothesize
0.01 w/v% EDTA will work to increase
corneal permeability............................................68

3.     Collateral estoppel precludes Appellants' claims....................70

4.     Lupin should receive intervening rights. .................................71

VI.    CONCLUSION..........................................................................................72

# <u>TABLE OF AUTHORITIES</u>

## Federal Cases

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009) ...........................................................65

*AK Steel Corp. v. Sollac & Ugine*,
   344 F.3d 1234 (Fed. Cir. 2003) ...........................................................67

*Alcon Research Ltd. v. Apotex Inc.*,
   687 F.3d 1362 (Fed. Cir. 2012) .................................................... 44, 60

*Alza Corp. v. Mylan Labs., Inc.*,
   464 F.3d 1286 (Fed. Cir. 2006) .................................................... 49, 60

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ...........................................................67

*Apotex Inc. v. Senju Pharm. Co.*,
   No. 12-00196 (D. Del. 2012) ...............................................................2

*Apple Inc. v. ITC*,
   725 F.3d 1356 (Fed. Cir. 2013) ...........................................................54

*Ariad Pharm., Inc. v. Eli Lily & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) ...........................................................67

*AstraZeneca Pharm., L.P. v. Apotex* Corp.,
   669 F.3d 1370 (Fed. Cir. 2012) ...........................................................63

*Bayer AG v. Elan Pharm. Research Corp.*,
   212 F.3d 1242 (Fed. Cir. 2000) .................................................... 26, 61

*Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*,
   713 F.3d 1369 (Fed. Cir. 2013) .................................................... 47, 57

*Bayer Schering Pharma AG v. Barr Labs.*,
   575 F.3d 1341 (Fed. Cir. 2009) .................................................... 37, 41

*Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*,
   402 U.S. 313 (1971) ............................................................................70

*Boston Scientific Corp. v. Johnson & Johnson*,
  647 F.3d 1353 (Fed. Cir. 2011) ..........................................................68

*Brenner v. Manson*,
  383 U.S. 519 (1966)...........................................................................69

*Broadcast Innovation, LLC v. Charter Commc'ns, Inc.*,
  420 F.3d 1364 (Fed. Cir. 2005) ..........................................................61

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*,
  501 F.3d 1254 (Fed. Cir. 2007) ..........................................................37

*Ecolochem, Inc. v. S. Cal Edison Co.*,
  227 F.3d 1361 (Fed. Cir. 2000) ..........................................................44

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
  471 F.3d 1369 (Fed. Cir. 2006) ..........................................................39

*Forest Labs., Inc. v. Abbott Labs.*,
  239 F.3d 1305 (Fed. Cir. 2001) ..........................................................62

*Galderma Labs., L.P. v. Tolmar, Inc.*,
  737 F.3d 731 (Fed. Cir. 2013) ..................................... 37, 40, 43, 47

*Glaxo Group Ltd. v. TorPharm, Inc.*,
  153 F.3d 1366 (Fed. Cir. 1998) ..........................................................61

*Glaxo, Inc. v. Novopharm, Ltd.*,
  110 F.3d 1562 (Fed. Cir. 1997) ..........................................................61

*In re '318 Patent Infringement Litig.*,
  583 F.3d 1317 (Fed. Cir. 2009) ..................................... 67, 69, 70

*In re Dillon*,
  919 F.2d 688 (Fed. Cir. 1990) (en banc) ..........................................40

*In re Kollman*,
  595 F.2d 48 (C.C.P.A. 1979) .............................................................56

*In re Mod*,
  408 F.2d 1055 (C.C.P.A. 1969) .........................................................57

*In re Ruschig*,
379 F.2d 990 (C.C.P.A. 1967) ...............................................................68

*Invitrogen Corp. v. Clontech Labs., Inc.*,
429 F.3d 1052 (Fed. Cir. 2005) ................................................. 49, 51

*JVW Enters., Inc. v. Interact Acc's, Inc.*,
424 F.3d 1324 (Fed. Cir. 2005) ...........................................................43

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007)...............................................................................40

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009) ...........................................................62

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) ...........................................................48

*Medtronic, Inc. v. Daig Corp.*,
789 F.2d 903 (Fed. Cir. 1986) .............................................................46

*Merck & Co., Inc. v. Biocraft*,
874 F.2d 804 (Fed. Cir. 1989) .............................................................57

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ...........................................................38

*Meyer Intellectual Properties, Ltd. v. Bodum, Inc.*,
690 F.3d 1354 (Fed. Cir. 2012) ...........................................................50

*Muniauction, Inc. v. Thomson Corp.*,
532 F.3d 1318 (Fed. Cir. 2008) ............................................. 44, 60, 70

*MySpace, Inc. v. Graphon Corp.*,
672 F.3d 1250 (Fed. Cir. 2012) ...........................................................45

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ............................................. 32, 43, 54

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
723 F.3d 1336 (Fed. Cir. 2013) ...........................................................68

*Ohio Willow Wood Co. v. Alps South, LLC*,
735 F.3d 1333 (Fed. Cir. 2013) ...........................................................71

*Ortho McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ...........................................................39

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*,
695 F.3d 1285 (Fed. Cir. 2012) ...........................................................51

*Panduit Corp. v. Dennison Mfg. Co.*,
810 F.2d 1561 (Fed. Cir. 1987) ...........................................................38

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .................................................... 49, 57

*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*,
170 F.3d 1373 (Fed. Cir. 1999) ...........................................................70

*PharmaStem Therapeutics, Inc. v. Viacell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) ...........................................................20

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
315 F.3d 1335 (Fed. Cir. 2003) ...........................................................45

*Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*,
732 F.2d 903 (Fed. Cir. 1984) .............................................................39

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000) .................................................... 67, 68

*Rasmusson v. Smithkline Beecham Corp.*,
413 F.3d 1318 (Fed. Cir. 2005) ...........................................................69

*Richardson-Vicks, Inc. v. Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997) ...........................................................57

*Rolls-Royce PLC v. United Tecs. Corp.*,
603 F.3d 1325 (Fed. Cir. 2010) ...........................................................39

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ...........................................................38

*Santarus, Inc. v. Par Pharm., Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012) ........................................................47

*Senju Pharm. Co. v. Apotex Inc.*,
    485 F. App'x. 433 (Fed. Cir. 2012) ............................................. 1, 19

*Senju Pharm. Co. v. Apotex Inc.*,
    717 F. Supp. 2d. 404 (D. Del. 2010)......................................... *passim*

*Senju Pharm. Co. v. Apotex Inc.*,
    836 F. Supp. 2d 196 (D. Del. 2011)............................................ 1, 19

*Senju Pharm. Co. v. Apotex Inc.*,
    891 F. Supp. 2d 656 (D. Del. 2012)..................................... 1, 21, 72

*Senju Pharm. Co. v. Apotex Inc.*,
    No. 2013-1027 (Fed. Cir. 2013) ...........................................................1

*Senju Pharm. Co. v. Apotex Inc.*,
    No. 2014-1058 (Fed. Cir. 2013) ...........................................................2

*Senju Pharm. Co. v. Strides, Inc.*,
    No. 13-00851 (D. Del. 2013).................................................................2

*Stevenson v. Sears, Roebuck & Co.*,
    713 F.2d 705 (Fed. Cir. 1983) ..........................................................70

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005) ........................................................47

*Szehinskyj v. Att'y Gen. of the United States*,
    432 F.3d 253 (3d Cir. 2005) .............................................................70

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
    492 F.3d 1350 (Fed. Cir. 2007) ........................................................39

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    723 F.3d 1363 (Fed. Cir. 2013) ........................................................68

*Tokai Corp. v. Easton Enters., Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011) ........................................................39

*Trilogy Commc'ns Inc. v. Times Fiber Commc'ns Inc.,*
109 F.3d 739, 745 (Fed. Cir. 1997) ...................................................51

*TriMed, Inc. v. Stryker Corp.,*
608 F.3d 1333 (Fed. Cir. 2012) ...........................................................44

*Unigene Labs., Inc. v. Apotex, Inc.,*
655 F.3d 1352 (Fed. Cir. 2011) ...........................................................47

*United States v. 68.94 Acres of Land,*
918 F.2d 389 (3d Cir. 1990) ...............................................................51

*W.L. Gore & Associates, Inc. v. Garlock, Inc.,*
721 F.2d 1540 (Fed. Cir. 1983) ..........................................................45

*Warner-Lambert Co. v. Apotex Corp.,*
316 F.3d 1348 (Fed. Cir. 2003) .................................................. 26, 63

*Wyeth and Cordis Corp. v. Abbott Labs.,*
720 F.3d 1380 (Fed. Cir. 2013) ..........................................................69

## Federal Statutes

15 U.S.C. § 2 ...................................................................................2

35 U.S.C. § 112 ........................................................................ *passim*

35 U.S.C. § 252 ...............................................................................71

35 U.S.C. § 271 ......................................................................... 63, 64

35 U.S.C. § 302 ...............................................................................71

35 U.S.C. § 307 ...............................................................................71

## LIST OF ABBREVIATIONS

| Allergan | Plaintiff-Appellant Allergan, Inc. |
|---|---|
| *Apotex* I litigation | *Senju Pharm. Co. v. Apotex Inc.*, 717 F. Supp. 2d 404 (D. Del. 2010), *aff'd*, 485 F. App'x 433 (Fed. Cir. 2012) (courtesy copies at A6454-A6483 and A6484-A6486, respectively). |
| BAK | Benzalkonium chloride |
| FDA | United States Food and Drug Administration |
| Grass 1985 | George M. Grass et al., *Effects of Calcium Chelating Agents on Corneal Permeability*, 26 Investigative Ophthalmology Visual Sci. 110 (1985) (A2707-A2710) |
| Grass 1988 I | George M. Grass & Joseph R. Robinson, *Mechanisms of Corneal Drug Penetration I: In Vivo and In Vitro Kinetics*, 77 J. Pharmaceutical Sci., 3 (1988) (A2773-A2784) |
| Grass 1988 II | George M. Grass & Joseph R. Robinson, *Mechanisms of Corneal Drug Penetration II: Ultrastructural Analysis of Potential Pathways for Drug Movement*, 77 J. Pharmaceutical Sci. 15 (1988) (A2799-A2808) |
| Griffith | D.E. Griffith, *"Improvement of the Color Stability of Parenteral Solutions of Papaverine Hydrochloride,"* 56 J. Pharmaceutical Sci. 1197 (1967) (A2043-A2045) |
| Hi-Tech | Defendant Appellee Hi-Tech Pharmacal Co., Inc. |
| HPE | Handbook of Pharmaceutical Excipients, 176-179 (Edetic Acid) (2d ed. 1994) (A2046-A2052) |
| Kompella | Udayabhaskar Kompella et al., *Paracellular Drug Transport in the Pigmented Rabbit Conjunctiva and Cornea*, 33 Investigative Ophthalmology Visual Sci. 1015 (March 15, 1992) (A2809-A2811) |
| Kyorin | Plaintiff-Appellant Kyorin Pharmaceutical Co., Ltd. |
| Lupin | Defendants-Appellees Lupin Limited and Lupin Pharmaceuticals, Inc. |
| Mitra | *Conventional Systems in Ophthalmic Drug Delivery*, *in Ophthalmic Drug Delivery Systems* 186-188 (Ashim K. Mitra ed., 1993) (A2768-A2772) |
| OpnBr. | Principal Brief for Appellants (D.I. 39) |

| PDR | Physician's Desk Reference (49th ed. 1995) (A4000-A4018) |
|---|---|
| Rojanasakul | Yongyut Rojanasakul et al., *Mechanisms of Action of Some Penetration Enhancers in the Cornea: Laser Scanning Confocal Microscopic and Electrophysiology Studies*, 66 Int'l J. Pharmaceutics 131 (1990) (A2785-A2798) |
| Senju | Plaintiff-Appellant and patent holder Senju Pharmaceutical Co., Ltd. |
| The '045 patent | Patent and Reexamination Certificate (U.S. Patent No. 6,333,045) (Oct. 19, 2012) (A38-A47) |
| The '456 patent | U.S. Patent No. 4,551,456 (A2711-A2713) |
| The '465 patent | U.S. Patent No. 4,780,465 (A2714-A2718) |
| The '470 patent | U.S. Patent No. 4,980,470 (A2719-A2731) |
| The '901 study | Study Report for Senju Study No. D2006B0901 (A2478-A2757) |
| The '904 study | Study Report for Senju Study No. D2006B0904 (A2758-A2767) |
| USPTO or PTO | United States Patent and Trademark Office |

## I. STATEMENT OF RELATED CASES

The '045 patent was previously litigated, and is currently at issue in two pending Federal Circuit cases as well as other District of Delaware cases.

- The district court invalidated claims 1-3 and 6-9 in *Senju Pharm. Co. v. Apotex Inc.*, 717 F. Supp. 2d 404 (D. Del. 2010) and *Senju Pharm. Co. v. Apotex Inc.*, 836 F. Supp. 2d 196 (D. Del. 2011). Senju never appealed the invalidity findings or judgment for claims 1-3, 6 and 8-9; its appeal was limited to claim 7, directed to "[a] method for preventing precipitation of Gatifloxacin crystals which comprises incorporating disodium edetate into an aqueous liquid preparation containing Gatifloxacin or its salt." The day after the October 4, 2012 oral argument, this Court affirmed the invalidity of original claim 7 of the '045 patent. *Senju Pharm. Co. v. Apotex Inc.*, 485 F. App'x. 433 (Fed. Cir. 2012) ("*Apotex* I") (Bryson, Dyk, Prost, JJ.).

- Senju later asserted reexamined claims against Apotex; the district court held claim preclusion prevented Senju from asserting its reexamined claims against Apotex. *Senju Pharm. Co. v. Apotex Inc.*, 891 F. Supp. 2d 656 (D. Del. 2012). Senju appealed. This Court heard oral argument on May 9, 2013 and a decision is pending in *Senju Pharm. Co. v. Apotex Inc.*, No. 2013-1027 (Fed. Cir. 2013) ("*Apotex* II") (Newman, Plager, O'Malley, JJ.).

1

- *Senju Pharm. Co. v. Apotex Inc.*, No. 2014-1058 (Fed. Cir. 2013) ("*Apotex III*") – Senju appealed the judgment from the Delaware district court following a stipulation by the parties. Senju filed a motion to stay those proceedings pending the current appeal.

- *Senju Pharm. Co. v. Strides, Inc.*, No. 13-00851 (D. Del. 2013) – Senju asserted the '045 patent's reexamined claims (the same claims at issue in this appeal) against another generic manufacturer. The defendants filed a motion to dismiss for lack of jurisdiction in view of the invalidity judgment in this matter. (A1-A2, A25-A34).

- *Apotex Inc. v. Senju Pharm. Co.*, No. 12-00196 (D. Del. 2012) – Apotex asserted Senju engaged in anticompetitive activity violating the Sherman Act, 15 U.S.C. § 2, by ceasing promotion of the 0.3% Zymar® ophthalmic gatifloxacin solution and encouraging physicians to switch to the 0.5% Zymaxid® ophthalmic gatifloxacin solution and asserting the invalid '045 patent.

- A panel of this Court denied Appellants' motion for an injunction pending appeal. Order, No. 2013-1630 (Fed. Cir. Sept. 30, 2013) (Dyk, Moore, Taranto, JJ.).

## II.   STATEMENT OF ISSUES

1.   ***Obviousness.***   Whether the district court correctly judged the asserted reexamined '045 patent claims (process/method claim 6, composition claims 12-16) invalid as obvious after considering the prior art teachings as a whole, including:

(a) Whether *ex parte* PTO reexamination proceedings insulated the claims from further district court scrutiny, particularly when Appellants, pretrial, abandoned alleged "unexpected results" evidence the PTO received; and the district court considered prior art the PTO lacked.

(b) Whether the district court correctly found one of ordinary skill was motivated to incorporate gatifloxacin into prior art fluoroquinolone ophthalmic formulations containing 0.01 w/v% EDTA.

(c) Whether the district court correctly found the prior art's teachings and known calcium-chelating EDTA property motivated using EDTA to increase corneal permeability with a reasonable expectation of success at 0.01 w/v% levels.

(d) Whether the prior art "teaches away" from 0.01 w/v% EDTA in corneal permeability methods when the district court specifically found the prior art reported some permeability increases using 0.01% w/v% EDTA.

(e) Whether the district court correctly found Appellants' "unexpected results" evidence unpersuasive when Appellants' studies:

(i) showed permeability remained correlated to EDTA level increases and decreases, as the prior art previously taught; and was comparable in scale to the permeability impact of other routine formulation modification steps (*e.g.*, pH adjustment);

(ii) generated error bars that were themselves of similar magnitude; and

(iii) reflected the type of variation consistent with what one would expect to achieve through routine optimization of the formulation.

(f)  Whether the district court properly referenced facts found in *Apotex* I when Appellants offered no new arguments about the prior art references, and such findings were unappealed in *Apotex* I.

2.    Whether the district court's ultimate judgment should stand given the multiple alternative grounds for judgment in Appellees' favor, notably:

(a) ***Noninfringement***.  Whether the district court's "analogous product" infringement analysis, and refusal to consider Lupin's label (which nowhere seeks approval for use to increase corneal permeability), was in error.

(b) ***Section 112***.  Whether the '045 patent possessed written description support and an enabling disclosure for a 0.01 w/v% EDTA formulation to increase corneal permeability under 35 U.S.C. § 112.

(c) ***Estoppel***.  Whether collateral estoppel precludes Appellants from asserting the '045 patent's reexamined claims.

(d) ***Intervening rights.***  Whether Lupin deserves intervening rights.

## III.   STATEMENT OF THE CASE

### *Nature of the Case*

Pre-trial, Lupin moved to dismiss for collateral estoppel.  (A4237; A4248-A4249).   Lupin disagrees its counterclaims were limited to invalidity for obviousness (OpnBr. at 4); Lupin sought a declaration of noninfringement, invalidity without limitation to obviousness, and collateral estoppel.  (A4652-A4654; A4671-A4673).   The district court's trial opinion held its judgment rendered moot Lupin's intervening rights request.  (A35-A36).

### *Statement of Facts*

Appellants' arguments are essentially two:  the district court erred by (1) disbelieving Appellants' theory the prior art taught using 0.01 w/v% EDTA in an ophthalmic formulation would not work to increase corneal permeability; and (2) refusing to find Appellants' alleged permeability increase was "unexpected." (OpnBr. at 3, 25-34, 43-54, 62).

The district court rejected both theories as a matter of fact (A32, A33-A34); nor were the claims limited to formulations achieving the alleged "unexpected" magnitude of permeability increase.  (A29 n.27 (composition claims 12-16 "do not include a limitation of increasing corneal permeability"), A32 n.30, A19 (method claim 6 requires only "an increased concentration")).

FDA never approved using Appellants' product in corneal permeability methods, and no such instruction exists in Appellants' or Lupin's ANDA labeling.[1] Neither does the '045 patent test 0.01 w/v% EDTA for corneal permeability enhancement. (A41, A1144, A1152-A1153, A1804, A1844).

Appellants pursued reexamined claims 6 and 12-16 hoping to bypass the district court's *Apotex* I invalidity judgment and the prior art teachings. They failed. As discussed below, Appellants lack a viable path to valid claims encompassing the formulations disputed here.

**A.** **Background to the technology, scope and content of the prior art.**

**1.** **Ophthalmic drug formulations.**

The eye is vulnerable to infections and other diseases; ophthalmic formulations have long existed to deliver drugs to the eye. (A40, A2712).

Ophthalmic drug formulations (eye drops) routinely possess ingredients that account for the chemistry of both the solution (to keep it stable and sterile) and the eye (to avoid irritation and enhance drug delivery). (A1306-A1307). Formulations involving polar drugs typically are aqueous; include preservatives; are kept in a narrow pH range; and incorporate isotonicity agents. (A1306, A1584, A1586, A1595, A1791-A1792; *Senju*, 717 F. Supp. 2d at 423 n.30).

---

[1] Appellants state Allergan "received FDA approval to market commercial embodiments of the claimed gatifloxacin ophthalmic solutions," citing their amended Complaint. (OpnBr. at 11). No witness so testified; Appellants never alleged commercial success. (A4083).

## 2. The prior art.

Appellants never disputed Appellees' cited '456, '465, and '470 patents; Grass 1985, Grass 1988 I, Grass 1988 II, Griffith, HPE references; and other publications from Rojanasakul, Kompella, Mitra, and the PDR, are prior art to the '045 patent. (A6380).

### a. Gatifloxacin and the fluoroquinolone drug class.

Appellants concede the skilled person knew: gatifloxacin was an antibacterial fluoroquinolone drug; topical compositions with other fluoroquinolones treated bacterial eye diseases; and gatifloxacin was more effective and selective. (OpnBr. at 6). Such teachings are found in, *e.g.*, the '456, '465 and '470 patents. The district court explicitly found such factors would motivate one of ordinary skill to pursue a gatifloxacin ophthalmic formulation. (A10, A27).

The '456 patent describes "topical ophthalmic formulations comprising norfloxacin *or a related antibiotic* as an active ingredient for the treatment of ocular infections." (A2712 (emphasis added); A1582-A1583). Appellants never disputed the '456 patent included an Example/formulation teachings that—save for the non-use of gatifloxacin—otherwise satisfied the composition elements in the asserted claims. (A1584).

8

The '456 patent's Example 1 discloses a norfloxacin ophthalmic solution:

| Formulation of 0.3% Solution | |
|---|---|
| Ingredient | mg/ml |
| EXAMPLE 1 | |
| Norfloxacin | 3 |
| sodium acetate 3H$_2$O | 2.72 |
| benzalkonium Chloride | 0.11 |
| ethylenediamine tetra-acetic acid, disodium salt | 0.10 |
| sodium Chloride | 7.42 |
| hydrochloric acid to pH | 5.2 |
| water | q.s. |

(A2713; A1583-A1584). The 0.1 mg/ml ethylenediamine tetraacetic acid disodium salt equates to 0.01 w/v% EDTA. (*Id*.) The '456 patent teaches using "from about 0.03 to 3% and especially 0.15% to 0.6% of medicament although higher or lower dosages can be employed"—a range encompassing the asserted '045 patent claims' gatifloxacin levels. (A2712; A1583). The Example and specification use tonicity agents, *e.g.*, "isotonic sodium ch[l]oride vehicles,... and the like." (A2712-A2713; A1584). Example 1's pH is 5.2, meeting the '045 patent claims. The *only* difference between the composition elements of the asserted '045 patent claims and the '456 patent is that the '456 patent does not specifically name the '470 patent's later-invented gatifloxacin. (A2712-A2713; A1583-A1584).

9

### b.    The calcium-chelator EDTA: general properties.

Appellants assign no error to the district court's findings the prior art taught EDTA chelates calcium; that chelating calcium from corneal membranes creates channels; that such channels increase polar compounds' corneal permeability; and that this mechanism has a dose-dependent correlation, in which the degree of corneal permeability increases/decreases as EDTA levels increase/decrease.  (A11-A13, A30-A31 (discussing Grass papers)).  The district court made these same findings in *Apotex* I, which Appellants never appealed.  *Senju*, 717 F. Supp. 2d at 410-11, 421-22.  Appellants do not challenge the prior art taught using EDTA in solutions in the 0.005 to 0.04 w/v% range to, *e.g.*, prevent solution discoloration by chelating or sequestering cations (including calcium). (A11; A2044; A2049; A1608-A1611, A1800-A1801).

### 3.    EDTA was a known corneal permeability enhancer.

### a.    The Grass papers.

Appellants recognize years before the '045 patent, Grass 1985 reported EDTA's calcium-chelating property sequestered calcium ions from corneal membranes.   (OpnBr. at 8; A12).   Such sequestration consequently created channels through which polar drugs penetrated corneal membranes.  (A12).  Grass 1985 first documented this effect using 0.5 w/v% EDTA solutions.  (A2708).

*Grass taught the wide effect of EDTA's corneal permeability-increasing properties*.  Appellants complain Grass never tested gatifloxacin, and used EDTA

10

levels fifty times greater than 0.01 w/v%.  (OpnBr. at 28).  But Grass 1985 recognized since "chelating agents are added routinely to ophthalmic medications for stability purposes" (A2707), his results would have a "direct bearing upon ophthalmic solutions currently in use" even though such solutions used EDTA amounts "at lower concentrations."  (A2709-A2710).

   *Polarity, not size*.  The district court found Appellants' size theory untimely. (A33-A34 n.35).  To allege error, Appellants crop an introductory quote from Grass 1988 I suggesting Grass *concluded* the size of the opening mattered to EDTA's ability to facilitate drug transport.  (OpnBr. at 9).  While Grass 1988 I ponders the theory, Table VI confirmed the drug sizes at issue here *did not* influence the permeability outcome.  (A2778; A1530).  Grass 1988 I confirmed not only glycerol, but compounds with molecular weights exceeding gatifloxacin's, *e.g.*, cromolyn, also crossed corneal membranes when combined with EDTA. (A2778; A1546, A1548, A1822-A1823).  Appellants solicited testimony from Dr. Grass on this issue, who confirmed, "[m]olecular weight hasn't been determined to have an impact or have—or be something guiding as to whether or not whether we consider if EDTA will have an effect or how much effect it will have."  (A1548). Dr. Grass continued, "[t]he only real physical chemical determinant that we know is one that has been stated in almost every article that references the use of EDTA and that's if the molecule is polar."  (*Id.*, *see also id*. (cromolyn, bigger than

glycerol and mannitol, achieved 141 percent improvement)).  Appellants' expert

Dr. Stella did not rebut this testimony or counter the premise via other literature.

Dr. Stella admitted that cromolyn, a polar compound (A1822) known for use in

ophthalmic solutions (A1817), is bigger than gatifloxacin (A1822-A1823), and was

readily transported (A1822)—thus negating Appellants' "size matters" theory.

Grass 1985 and Grass 1988 I thus confirmed that what impacted whether

EDTA-induced permeability occurs was the drug's polarity.  (A30; A2778; A1503,

A1548, A1837, A1843-A1844).  Appellants never disputed those of ordinary skill

would have recognized gatifloxacin, like other fluoroquinolones, was a polar drug.

(A10; A1589, A1595-A1596, A1848; *Senju*, 717 F. Supp. 2d at 410).

*Concentration correlation*.  Appellants accept Grass 1988 I and Grass 1988

II established a correlation between the degree of corneal permeability observed

and EDTA concentration, with higher EDTA concentrations producing higher

permeability numbers.   (OpnBr. at 8-9; A2774-A2775, A2777-A2778, A2803,

A2807).  Appellants mischaracterize such references as establishing a 0.01 w/v%

threshold where EDTA's effect on corneal permeability was zero and nothing but.

(OpnBr. at 8-9; *cf. id.* at 30 (Appellants recognize at least some "small increase"

occurred)).  Lupin's expert explained the art showed the skilled person "EDTA

works at exceedingly low concentrations" and didn't "magically start" at a specific

number. (A1695). The district court expressly found neither Grass nor others in the art taught EDTA stopped working at 0.01 w/v% levels. (A30-A31).

Appellants charge that Grass 1988 I, in Table XIII, assigned a "0" to the 0.01 w/v% EDTA numbers "because they deemed the measured result unreliable." (OpnBr. at 30). Appellants' citations are unsupportive. The "0" in Table XIII so central to Appellants' theories here (OpnBr. at 9, 29, 30, 49, 55, 61) merely signaled the data did not reach statistical significance. (A1531).[2] One of ordinary skill reading Grass 1988 I nevertheless observed raw data confirming an *actual measured increase* even at 0.01 w/v% EDTA levels. (A2780; A1503-A1504, A1696; OpnBr. at 30). Grass 1988 I never concluded 0.01 w/v% EDTA wouldn't work; rather, he explained that across the three EDTA concentrations used (0.01, 0.05, 0.1%), there was a "progressive increase in permeability," and that while only the two higher concentrations were statistically significant, the timing of the exposure also influenced the overall degree of permeability. (A2780; OpnBr. at 8).

Appellants ignore the Table XIII exposure time was only 20 minutes. (A1539-A1540). Table III showed that for the 0.5 w/v% dose, the measured results increased considerably (from +106% to +823%) when comparing the 20 versus 30 minute results; the overall concentrations peaked at 60 minutes:

---

[2] Appellants' own 0.01 w/v% EDTA/gatifloxacin results produced increases that were numerically larger, but statistically *insignificant*. (*See* Section V(A)(3)(c)).



Figure 4—Aqueous humor levels of glycerol with and without coadministration of 0.05% EDTA. Error bars represent ± 1 SD.

(A2777 (Fig.4); A1539-A1540, A1544). To argue their own gatifloxacin with 0.01 w/v% EDTA test results achieved 27 or 40% permeability increases, Appellants rely on raw data increases recorded at the 30 and 60 minute marks. (*See* Section V(A)(3)(c) below).

*Repeated dosing.* Appellants disparage Grass 1988 I's three-hour *in vitro* study data. (OpnBr. at 29, 30). Contrary to Appellants' rephrasing of his testimony (*id*.), Dr. Grass unremarkably explained it was well known the longer tissue is exposed to EDTA, the greater the effect (A1541).

*In vitro, in vivo conditions*. Appellants fault the prior art's lack of *in vivo* corneal permeability studies below the 0.1 w/v% EDTA levels Dr. Grass used in Grass 1988 I. (OpnBr. at 31). This position conflicts with their own expert's, who warned that animal ethics limited the nature and scope of tests one could perform, and that *in vitro* testing is a necessary predicate to *in vivo* testing. (A1311, A1412, A1819). The '045 patent itself (which performs neither *in vitro* nor *in vivo* testing

14

with less than 0.05 w/v% EDTA (A1144)) fails to meet Appellants' standard, as do Appellants' infringement proofs (*see* Section V(B)(1)).

***Grass 1988 II***.   Appellants assert Grass 1988 II showed EDTA did not enhance permeability at 0.01 w/v% levels because the epithelial tissue appeared visually undamaged, whereas EDTA levels above 0.01 w/v% caused increased permeability ***and*** increased size of intercellular spaces of epithelium and endothelium.   (OpnBr. at 9 (quoting A2807)).   No trial witness supported Appellants' attorneys' theory that visual appearance of intercellular space size was a corneal permeability proxy, because it isn't; they are distinct phenomena.   Dr. Grass confirmed that 0.01 w/v% EDTA was not demonstrated to show increases in permeability ***and*** expansion of ***both*** the intercellular ***and*** intracellular spaces. (A1510-A1511).   Dr. Grass explained this statement does not teach 0.01 w/v% EDTA concentrations failed to increase corneal permeability alone.   (*Id*.)   When asked whether one can have "increased corneal permeability ***without*** having a visual increase in size of intercellular spaces of the epithelium and endothelium;" Dr. Grass responded, "[a]bsolutely."   (A1511 (emphasis added)).

### b.    Other references.

Appellants rely on Kompella and Mitra (OpnBr. at 9), but neither state 0.01 w/v% EDTA doesn't work.   Kompella never tested or commented on 0.01 w/v% EDTA formulations.   (A2811).   Mitra *agreed* Grass's work showed more drug

penetration "where increases in the permeability" occurred, and agreed with Grass's explanation for why that was so—because EDTA decreased calcium concentration. (A2772).

Appellants quote from Mitra regarding 0.2 and 5 mM EDTA doses being devoid of any effects (OpnBr. at 9, 23, 29, 61), but omit the salient fact such numbers originated from *others'* tests with a *different* compound that, even without EDTA, had no transport across the membranes. (A1536-A1537). Since Grass's glycerol transported across membranes without EDTA, Grass correctly used glycerol to evaluate EDTA's corneal permeability-enhancing effect; and indeed did show EDTA's concentration-dependence. (A2783).

Mitra does not teach away from Grass's teachings that a range of EDTA levels increased corneal permeability; to the contrary, Mitra blesses Grass's proposed mechanism that EDTA sequestered calcium from "'tight' epithelia, decreasing the transepithelial resistance to water-soluble compounds"; recognizes the testing "suggest[ed] a concentration dependence"; and expressed "an EDTA-drug combination does deserve some consideration in improving the bioavailability of poorly penetrating drugs." (A2772).

Appellants contend Rojanasakul does not supplement Grass's teachings to show even lower EDTA levels may work since Rojanasakul measured electrical resistance of ions, not aqueous humor *in vivo*. (OpnBr. at 32-34). Appellants raise

a variety of uncited attorney characterizations about the reference's teachings (*id.*) that no trial witness offered.

Rojanasakul chose his method because focusing on the ions passing through the system "provide[d] quantitative assessment of the promoting effect of the enhancers," and "indicate[d] changes in dimension of the aqueous transport pathway, i.e., the tight junction" as well as accompanying "structural damage" to the membrane's surface. (A2787). Rojanasakul confirms his prior work showed "changes in electrical resistance and capacitance *correlate well* with changes in the aqueous intercellular space and membrane surface integrity, respectively." (A2795 (emphasis added)). Appellants admit intercellular space is the space between cells through which gatifloxacin travels (OpnBr. at 34), and that Rojanasakul reported electrical resistance changed after being exposed to EDTA levels as low as 0.01 mM (0.00037 w/v%). (*Id.* at 32-33).



Fig. 9. Effect of dose of EDTA on corneal resistance. Positive correlation between concentration of EDTA and corneal resistive response is shown. Bars indicate 1 SE, n = 4.

17

(A2796). From this, the skilled person could reasonably conclude even very low EDTA levels would impact the cellular junctions, thereby promoting transport. (A1489-A1490, A1499-A1500; A1513 ("at every concentration, they saw a decrease in the resistance across the cornea and this is generally translated to an increase in access to the paracellular spaces, so similar to the studies where we actually measure permeability of the compounds, this was another way to measure that in real time.")). As Dr. Grass testified, the impact caused by EDTA was seen "very early…certainly within the first 30 minutes." (A1514).

*Summary*. The district court ultimately concluded that Grass and others (*e.g.*, Rojanasakul) sufficiently documented and suggested that the EDTA calcium-sequestration continued at a continuum of EDTA levels of not only 0.5, 0.1, 0.05, and 0.01 w/v%, but also as low as 0.00037 w/v%. (A12-A13, A29-A31, A32). With EDTA's calcium extraction properties established at even these low levels, it would have been reasonable for the person of ordinary skill to expect 0.01 w/v% EDTA would increase the corneal permeability of a polar drug. (A32).

18

## B.     The '045 patent.

### 1.     The original patent application and claims.

The '045 patent's original U.S. filing date is April 21, 2000.[3]    (A39).

Named inventor Yasueda testified the specification involved three different

inventions:  (1) improving gatifloxacin's corneal permeability (A1143); (2) using

EDTA to prevent solution discoloration (*id.*); and (3) using EDTA to prevent

gatifloxacin crystal precipitation (A41 col.4, ll. 20-30; *see also* original claims 8

and 7, respectively (A43)).   None constitute patentable inventions, as *Apotex* I

revealed.   In *Apotex* I, Senju's expert refused to opine using EDTA to prevent

discoloration (original claim 8) was non-obvious.  *Senju*, 717 F. Supp. 2d at 424.

The district court invalidated as obvious all composition claims, *id*. at 419-21, and

the use of EDTA to enhance corneal permeability.  *Id.* at 411.  Senju did not appeal

these findings.  Appellants' *Apotex* I theory claim 7 "unexpectedly" used EDTA to

prevent precipitation failed before the district court and this Court.  *Senju*, 836 F.

Supp. 2d at 209-210; *Senju*, 485 F. App'x at 433.

Appellants now emphasize corneal permeability's importance.  The '045

patent asserts EDTA concentrations "normally used for raising corneal

permeability is 0.5 w/v%."  (A41 col. 4, ll. 6-10).  This is binding on Appellants.

---

[3]  Appellants assert (OpnBr. at 5) the relevant invalidity date is August 21, 1998.
Appellants failed to prove any priority claim.   Yasueda admitted Examples
Appellants contend encompass its commercial product were added at least a year
later. (A1158).

*PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007).

Yasueda acknowledged the specification's gatifloxacin corneal permeability description only taught this phenomenon occurred at "[1/10] amount as much as that normally used," equating to 0.05 w/v% EDTA levels—five times higher than the 0.01 w/v% EDTA levels the currently-asserted claims require. (A1152). Yasueda conceded his specification never disclosed using lesser 1/50th fractions of "normal" actually worked for this purpose. (A1144, A1152-A1153). Yasueda admitted he never tested a 0.01 w/v% EDTA formulation for corneal permeability enhancement before his patent application filings. (A1135). Appellants lacked gatifloxacin/0.01 w/v% EDTA corneal permeability test results until September 2006, almost 5 years *after* the '045 patent issued. (A2748, A2758). While Appellants today tout these studies as showing unexpected improvements, the reports concluded there were "no significant differences" in performance between a formulation with 0.01 w/v% EDTA, and one without. (A1215; *see also* A1740; A33 n.34 ("Plaintiffs did not account for the large error bars seen in the data.")).

Appellants suggest Yasueda's early work generated "unsuccessful results." (OpnBr. at 10). That is a misnomer. Third-party Kyorin initially prepared gatifloxacin formulations using each and every element of claim 12 except EDTA and observed discoloration. (A4025-A4029; A1869-A1871). Kyorin later added

0.01% EDTA (A4035); and did not note discoloration concerns. This EDTA-containing formulation satisfies the claims here. (A4042; A1876-A1877; *see also*, *Senju*, 717 F. Supp. 2d at 425). Additionally, Yasueda admitted he never attempted preparation of the successful prior art fluoroquinoline ophthalmic formulations, such as those found in the prior art '456 patent. (A1156-A1157).

Appellants tout Yasueda "eventually invented a composition of gatifloxacin and EDTA that increased gatifloxacin concentration in the aqueous humor between '1.2 times and 1.5 times' as compared to the same composition without EDTA." (OpnBr. at 10). Those compositions ***lacked*** the 0.01 w/v% EDTA claimed here; they possessed 0.05 w/v% EDTA. (A41). None of the originally-filed claims were directed to a 0.01 w/v% EDTA species. (A43). Notwithstanding, Appellants waived reliance on Yasueda's efforts as evidence of patentability, and the district court expressly warned Appellants not to "misuse[]" it as implicating secondary considerations on appeal. (A1113-A1115).

### 2. The reexamination application and claims.

Appellants first focused on securing a 0.01 w/v% EDTA claim for increasing corneal permeability in 2011, during PTO reexamination proceedings. (A2092, A2100-A2107; *Senju*, 891 F. Supp. 2d at 658-59; OpnBr. 11-12). The PTO nevertheless initially rejected them for obviousness. (*Id.*)

Appellants responded claim 6's corneal permeability method and claims 12-16's compositions should stand given "unexpected, superior results relating to increasing corneal permeability and preventing precipitation" of gatifloxacin from solution. (A2638; A2647; A2662 (preventing precipitation was the emphasis of the unexpected result for claim 12 composition; examiners were "eager" to receive such evidence)).

Appellants additionally argued the claims should survive because the skilled person would not use 0.01 w/v% EDTA to increase corneal permeability under the theory that Table XIII in Grass 1988 I taught 0.01 w/v% EDTA "is <u>not</u> effective." (A2646 (emphasis in original); *see also* A2103, A2663). Appellants specifically represented to the PTO via the Declaration of Dr. Mayo (statistician), that their '901 study showed statistically significant results for the 0.01 w/v% EDTA formulation. (A2683).

The PTO issued the claims expressly relying on Appellants' representations. (A2692 (referencing Dr. Mayo's statistical significance assertion)).

### C.  The theories presented to the PTO during reexamination collapse before the district court.

Outside the comfort of the PTO's *ex parte* proceedings, at trial the evidence and theories Appellants presented to the PTO were either preemptively abandoned, or failed to withstand scrutiny. (*See* A30-A34).

Pre-trial, Appellants abandoned unexpected results based on preventing gatifloxacin precipitation. (A4085-A4086).

At trial, Dr. Mayo admitted the '901 study *did not* show the gatifloxacin-0.01 w/v% EDTA solution produced corneal permeability benefits that were statistically significant compared to a non-EDTA solution:

> Q. …In your opinion, the differences in concentration of gatifloxacin in the aqueous humor resulting from the application of gatifloxacin solution containing EDTA and gatifloxacin solution omitting EDTA **was not statistically significant; is that correct**?

> A. Correct.

(A1215 (emphasis added)).

The district court heard testimony from not just Appellants' Dr. Stella about the Grass papers' teachings, but also Lupin's experts (Dr. Sherman and Dr. Grass himself). The district court's opinion reproduced the Grass 1988 I Table XIII data Appellants had emphasized to the PTO (A30 n.28; A2781). The district court explicitly recognized Appellants contended Table XIII taught the skilled person that "zero increase in corneal permeability would be expected when using 0.01 w/v% EDTA." (A32). But having weighed the credibility of the experts, and reviewed Grass 1988 I as a whole, the district court found more persuasive Lupin's experts' opinions that the skilled person *would not* interpret it as teaching "no increase" occurred at that level. (*Id.*) Grass 1988 I's raw data reported outside Table XIII showed the skilled person that numerically, the corneal permeability

23

levels *did* increase compared to control—even with the 0.01 w/v% EDTA formulations.  (A1503-A1504, A1696).

The district court credited Lupin's experts that post-Grass 1988 I prior art—Rojanasakul—suggested to the skilled person that not only 0.01 w/v% EDTA, but even lower 0.00037% w/v EDTA increased permeability.  (A13, A31).  The district court found the prior art consistently recognized a "dose dependent relationship between EDTA concentration and corneal permeability," which, given Rojanasakul's results, further "suggests the use of concentrations as low as 0.01 w/v% EDTA would be effective to increase corneal permeability."  (A31).  Rojanasakul was not before the PTO during the reexamination proceedings.  (A2064-A2065, A2561, A2673, A2693).

The district court was rightly unimpressed with the magnitude of the alleged unexpected permeability.  Appellants' own study reports, "addition of the 0.01 % EDTA does not make a significant change in the concentration after one hour of instillation."  (A2749).  The 27 and 40% permeability increase numbers in the raw data Appellants rely on (OpnBr. at 16) occurred in studies where all of the numbers (including control values) widely varied.  (A33 n.34 (large error bars unexplained)).  The raw data percent increases also were comparable in scale to permeability changes resulting from simple pH adjustments.  (A33).

The district court further observed the percentages Appellants offered, while numerically more than the no-EDTA control, were numerically less than those achieved with higher 0.05 w/v% EDTA levels. (*Id*.) That EDTA increases/ decreases correlated to gatifloxacin permeability increases/decreases was unsurprising when the prior art (*e.g.*, Grass's papers) already recognized this correlation existed with polar compounds. (A11-A13). The district court found achieving changes on this order of magnitude thus reflected the "product of routine optimization…." (A33-A34).

### D. Intervening rights, collateral estoppel, noninfringement.

Defendants filed their ANDAs with Paragraph IV certifications after the district court invalidated the original '045 patent claims (A1446, A1477, A1756-A1757), and relied on that judgment before engaging in the substantial risk associated with Hatch-Waxman cases. (A1446, A1477, A1756-A1757). The district court deemed moot whether this justified intervening rights. (A35-A36).

Appellants originally sued Lupin on the original '045 patent to secure a Hatch-Waxman 30-month stay. (A4515, A4548). Appellants later asserted reexamined claims 6 and 12-16. (A4581, A4616).

Lupin moved to dismiss for collateral estoppel. (A4237). The district court declined to reconsider collateral estoppel in its decision. (A7).

25

Though reexamined claim 6 requires a method of using 0.01 w/v% EDTA to raise corneal permeability of an aqueous pharmaceutical gatifloxacin eye drop solution (A47), Appellants never tested theirs or Defendants' products (including in humans) to show such EDTA levels increased gatifloxacin corneal permeability. To date, it remains clinically unknown whether humans actually infringe. The district court recognized during trial a patentee cannot prove "infringement by analogy with missing ingredients and adding ingredients." (A1396).[4] The district court nevertheless did just that, finding Appellants' "probative" evidence of corneal permeability increases on *other* products (that lacked, *e.g.,* the known corneal permeability enhancer BAK, which Defendants' product include) and rabbit testing constituted proof Defendants' ANDA products, intended solely for human use, would directly infringe. (A20-A21).

However, **Lupin** cannot directly infringe the claim 6 method; generic drug manufacturers do not directly infringe method-of-use claims. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003). Method-of-use claims in Hatch-Waxman cases evaluate ANDA product label statements and whether the label encourages patients to engage in the claimed method of use. Appellants offered no evidence Lupin's ANDA labeling encourages doctors and patients to

---

[4] The ANDA product, as defined by the specification, must be shown to infringe, not a proxy or "analogous" product. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1242, 1248-49 (Fed. Cir. 2000).

use its product in a method for enhancing corneal permeability because they cannot.  Using EDTA to enhance corneal permeability *is not* an FDA-approved use for the products at issue here.  (A4750, A5519).  The district court refused to consider whether the *patentee* met its burden on indirect infringement.  (A24 n.25).

The district court declined to import into composition claims 12-16 a further limitation that the compositions achieve corneal permeability.  (A29 n.27, A32 n.30).  To the extent Appellants contend their composition claims should be resurrected as non-obvious for achieving "unexpected" corneal permeability values, then the district court's infringement decision must be vacated to consider anew whether Appellants have actual evidence Lupin's ANDA products will (a) manage to achieve the alleged unexpected corneal permeability under approved conditions of use; and (b) include labeling directed to achieving corneal permeability.

## IV.  SUMMARY OF THE ARGUMENT

The district court's invalidity judgment should be affirmed.  The district court considered Appellants' timely raised arguments here, and made factual findings fully supported by the record in Lupin's favor.  Appellants, not the district court, offer a legally and factually incorrect obviousness analysis.

1.    The district court reviewed all four *Graham* factors before reaching its ultimate obviousness conclusion.  (A25).  The district court expressly recognized, and rejected, Appellants' contention that Grass 1988 I and other references taught 0.01 w/v% EDTA would not work (A30) and lead the skilled person to expect "0" permeability at such EDTA levels (*id.*)—the foundational premise for Appellants' teaching away/discouragement/unexpected results appeal arguments.  (OpnBr. at 9, 17, 22-23, 29-30, 37, 61).  The district court based that decision in part on the credibility of Lupin's experts (A30-A31), a factual determination rarely disturbed on appeal.  Nor was the district court obligated to respond to irrelevant or unsupported attorney arguments Appellants offered about the prior art.  The district court likewise did not err by declining to regurgitate the identical reasoning for the identical factual findings that Appellants never appealed in *Apotex* I.  Nevertheless, the district court repeated a complete obviousness analysis for each claim Appellants asserted (A25-A34); all of the district court's findings are supported by evidence of record from this case.

28

2.      Appellants wrongly charge error and hindsight bias on secondary considerations.  That the district court entertained Appellants' evidence does not render it meaningful or persuasive.  The district court provided multiple reasons why it credited Lupin's experts over Appellants' experts; and found Appellants' so-called unexpected results evidence never demonstrated an unexpected result. The district court rightly did not unquestioningly accept the PTO's conclusion when Appellants (or their witnesses) abandoned or disavowed representations and evidence upon which the PTO relied.

3.      The district court correctly concluded that an otherwise-obvious composition one of ordinary skill was motivated to prepare irrespective of its corneal permeability properties does not become patentable because it ostensibly increases corneal permeability.  For the district court to have held otherwise would have invited legal error.

4.      Notwithstanding the invalidity of the asserted '045 patent claims, the district court's judgment for Lupin should be affirmed for at least the following reasons:  (a) Appellants' evidence involving *other* products in animals could not prove direct human infringement by Defendants' ANDA product uses; (b) the district court's refusal to compare Lupin's labeling to method elements was in error; (c) the '045 patent's specification fails the written description and enablement requirements of 35 U.S.C. § 112, particularly given Appellants'

29

insistence one of ordinary skill needed to know 0.01 w/v% EDTA actually worked to increase corneal permeability *in vivo*; (d) collateral estoppel; and (e) intervening rights.

## V.   ARGUMENT

### A.   The district court correctly found the asserted claims obvious.

The district court's obviousness invalidity judgment should be affirmed.

#### 1.   The district court applied the correct legal standards.

The district court correctly articulated the legal standard to apply, including all four *Graham* factors (A25); recognized the insufficiency of merely finding claim elements independently in the prior art absent "a reason to combine the elements in the manner claimed" (*id.*); and observed that even with a reason to make a composition or carry out a claimed process, one of ordinary skill should also have a "reasonable expectation of success." (A26).  The district court accepted the '045 patent was entitled to a presumption of validity and that Lupin had to establish the underlying factual proofs of obviousness by clear and convincing evidence. (*Id.*)

Appellants repeatedly argue the PTO's views should prevail over the district court. (OpnBr. at 18, 27, 41, 53, 66-67).  The district court recognized one presumes the PTO did its job properly. (A26).  But the PTO expressly relied on Appellants' representations that: Grass 1988 I taught 0.01 w/v% EDTA wouldn't work; and Senju achieved statistically significant corneal permeability and precipitation prevention results with 0.01 w/v% EDTA. (*See* Section III(B)(2) above; A2648, A2651).  As to the first, the PTO lacked the Lupin expert testimony the district court deemed credible (A30-A31), or Rojanasakul's showing even

31

lower EDTA levels increased permeability (A31). As to the second, Appellants abandoned their precipitation-prevention theory pre-trial. (A4085-A4086). Also, Appellants' expert admitted Senju's 0.01 w/v% EDTA '901 study *was not statistically significant*. (A1215). The district court correctly reached a different ultimate conclusion on obviousness. *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1356-1357 (Fed. Cir. 2013).

Appellants also argue the district court concluded obviousness without considering secondary considerations. (OpnBr. at 43-45). As Section V(A)(3)(c) discusses, the district court did not render findings on the ultimate conclusion of obviousness until *after* considering Appellants' relevant secondary considerations evidence. (A32-A34).

Thus, the district court applied the proper framework, and its substantive analysis was legally and factually correct.

> **2.** *Graham* **factors 1 and 2: there was no dispute Lupin's cited references were prior art; nor was the level of ordinary skill in the art material to the outcome.**

The parties agree the cited '456, '465, and '470 patents; and Grass 1985, Grass 1988 I, Grass 1988 II, Griffith, HPE; Rojanasakul, Kompella, Mitra and PDR references are prior art.

The parties each similarly defined one of ordinary skill, and no dispute turns on differences between these respective definitions or impacts the interpretation of prior art teachings.  (A1314, A1488, A1580-A1581).

>    **3.    *Graham* factors 3 and 4:  the district court identified potential differences between the art and the claims; recognized the importance of the 0.01 w/v% EDTA claim element added during reexamination; and only found obviousness *after* considering Appellants' so-called "secondary considerations" theories.**

In *Apotex* I, Senju asserted composition claims (1-3, 9) and a corneal permeability method claim (6) directed to gatifloxacin eye drops.  Such claims included elements directed to a pH in the range of 5-8, and EDTA amounts construed to encompass a range of 0.001-0.2 w/v%.  *Senju*, 717 F. Supp. 2d at 419-20.  Senju *never* appealed the district court's underlying findings or judgment for these claims in *Apotex* I.  (*Id.*)  Appellants were not entitled to a second bite at the apple to reargue the same art and the same elements on collateral estoppel grounds.  (*See* Section V(B)(3), below).

Nevertheless, once Lupin moved to dismiss, Appellants insisted a *single* difference between the old invalid claims and its reexamined claims precluded collateral estoppel dismissal:  the 0.01 w/v% EDTA claim element added during reexamination:

33



*Original Claim 6*          *Reexamined Claim 6*

EDTA = 0.001 - 0.2 w/v%      EDTA = 0.01 w/v%
x = Court Holding EDTA = 0.1 w/v%    x = Court Holding EDTA = 0.1 w/v%

(A4420; *see also* A2100, A2647).

Appellants' singular focus at trial involved 0.01 w/v% EDTA for corneal permeability; Appellants never raised the arguments *Apotex* I rejected or new arguments outside this issue. Appellants' experts offered no opinions defending the non-obviousness of the claim elements relating to pH, gatifloxacin percentages, use of isotonic agents, or the combination thereof in an ophthalmic formulation. (A1779-A1791). Appellants' expert opined *solely* upon the question of whether one of ordinary skill would expect 0.01 w/v% EDTA to work to increase corneal permeability. (A1788). Despite this, Appellants complain the district court's analysis failed to view the claims "as a whole." (OpnBr. at 39-43). The district court need not "find" anew facts Appellants did not dispute at trial or those already found and not appealed in *Apotex* I because such facts are undisputable. Appellants cite no case holding otherwise.

Even so, the district court's obviousness analysis correctly considered as a whole *all* of Appellants' newly-added elements involving "using 0.3 w/v% to 0.8

w/v% gatifloxacin;" a "pH of above 5 to about 6"; and "using 0.01 w/v% EDTA" including "to increase corneal permeability" in the context of the prior art, likewise viewed as a whole. (A26).

### a. Composition claims 12-16.

Composition claim 12 states:

12. An aqueous liquid pharmaceutical eye drop composition which comprises from about 0.3 to about 0.8 w/v% Gatifloxacin or its salt, about 0.01 w/v% disodium edetate [EDTA], and wherein the aqueous liquid pharmaceutical composition has a pH of from about 5 to about 6.

(A47). Dependent claims 13-16 add: a 0.3 or 0.5 w/v% gatifloxacin limitation (claims 13, 14); and an isotonic agent (claim 15, specifying a group; claim 16, specifying sodium chloride). (*Id*.)

### i. There are no differences between composition claims 12-16 and prior art combinations that substitute gatifloxacin into existing fluoroquinolone eye drops.

Post-trial, the only *composition* element Appellants deemed missing from the '456 and '465 fluoroquinolone ophthalmic formulation patents was an express mention of "gatifloxacin or improving corneal permeability of any drug." (A2830). Appellants similarly complain the references *singly* lack the claimed gatifloxacin ophthalmic formulation. (OpnBr. at 25, 59-60). This is irrelevant; Lupin's obviousness defense combined the '456/'465 patents with the '470

patent's gatifloxacin disclosures. (A27-A29). Nor is corneal permeability a composition claim element. (A29 n.27, A32 n.30).

### ii. The district court's findings.

Rather than rest on *Apotex* I or "cherry pick" composition teachings, (OpnBr. at 39-43, 59-66), the district court made new fact findings specific to the reexamined claims as a whole, even beyond the 0.01 w/v% EDTA issue Appellants pursued at trial.

Appellants criticize the district court's obviousness analysis (OpnBr. at 59-66), but *their own scientific expert refused to defend validity* on motivation to combine; the references' teachings; or claim differences. Appellants objected to Lupin's cross-examination of Appellants' expert on questions impacting "[Lupin's] prima facie case." (A1795-A1796). On cross-examination, Dr. Stella admitted one of ordinary skill would use 0.01 w/v% EDTA to preserve sterility (A1791-A1792), and protect against discoloration (A1797-A1799).

As Section III(A)(2)(a) explains, the '456 patent taught using "[n]orfloxacin and structurally related antibiotics" in topical ocular formulations containing various features—including 0.01 w/v% EDTA and 5.2 pH—encompassed by the composition claims. (A27-A28; A2712-A2713; A1590-A1591, A1633). The '456 patent's degree of formulation detail is analogous to the "data sheet" that rendered composition claims obvious in *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731,

736-38 (Fed. Cir. 2013). The '465 patent likewise taught preparing stable ophthalmic fluoroquinolone compositions with ingredient ranges encompassing those claimed. (A27-A28; A2715-A2716; A1590-A1591, A1619).

The district court correctly found motivation by one of ordinary skill to improve '456/'465 patents' formulations by incorporating the '470 patent's gatifloxacin, and that such combination disclosed "each limitation of the product claims". (A10, A27-28). Appellants never disputed the art viewed gatifloxacin as an improved fluoroquinolone; this resolves motivation to combine. *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254 (Fed. Cir. 2007) (combining ofloxacin and ciprofloxacin teachings); *Bayer Schering Pharma AG v. Barr Labs.*, 575 F.3d 1341, 1349 (Fed. Cir. 2009) (combining spirorenone and drospirenone teachings). The '470 patent's gatifloxacin eye drop teaching (A14), teachings directed to the same drug class (A10), and evidence gatifloxacin should work in the '456 patent's formulation (A2712; A1582-A1585) allowed the district court to conclude one of ordinary skill would reasonably expect substituting gatifloxacin into such formulations would produce an aqueous gatifloxacin ophthalmic formulation (A27). Since Appellants' so-called secondary considerations evidence involved an unclaimed irrelevant corneal permeability element, the district court held the claims obvious. (A29 n.27).

### iii.    Appellants show neither legal nor factual error in the district court's composition claims analysis.

The district court's obviousness analysis was correct.

### (A).    Time alone is irrelevant.

Appellants assert the years between the prior art and their filing date "is itself evidence of nonobviousness."  (OpnBr. at 25 (citing *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561 (Fed. Cir. 1987))).  Appellants waived this issue.[5]  (A2848-A2853, A2858-A2859).  *Panduit* lacked references "disclos[ing] or suggest[ing] all the claimed structural limitations," 810 F. 2d at 1577; here, several do.  Nor could others *commercially* exploit ophthalmic gatifloxacin formulations during the '470 patent's life.  *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376-77 (Fed. Cir. 2005) (compound patent prevented commercializing once-weekly compound uses).  Kyorin also made a 0.01 w/v% EDTA gatifloxacin formulation before the Senju patentee here.  (A4035, A4042).

### (B).    Corneal permeability is not outcome-determinative for claims 12-16.

Appellants' corneal permeability/teaching away arguments (OpnBr. at 26-27, 61) are irrelevant to claims 12-16.

---

[5] *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("appellate courts do not consider a party's new theories, lodged first on appeal").

The district court found no corneal permeability element exists in composition claims 12-16.[6]  (A29 n.27, A32 n.30).   Appellants' cases are inapposite.  (OpnBr. at 65-66).

*Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 732 F.2d 903 (Fed. Cir. 1984) observed product "sales pitches" are typically unclaimed; thus, courts review *patented* features that may indicate commercial success.  Appellants never argued corneal permeability drove commercial sales.  (A4083).

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369 (Fed. Cir. 2006); *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350 (Fed. Cir. 2007) and *Ortho McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358 (Fed. Cir. 2008) considered whether nonobvious aspects of a *new compound*'s chemical structure possessed unique properties versus prior art compounds, an analysis inapplicable here since gatifloxacin was known.

The secondary considerations nexus must derive from "the patentably distinct feature of the invention," *Rolls-Royce PLC v. United Tecs. Corp.*, 603 F.3d 1325, 1340 (Fed. Cir. 2010), not prior art features.  *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011).  Appellants tie corneal permeability to

---

[6]  The district court did not require corneal permeability proof in its infringement analysis.  (A24 n.25).

EDTA and pH (OpnBr. at 65-66) at levels the district court found already existed in prior art formulations, (A28), precluding nexus.

More applicable is *In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990) (en banc). The prior art nowhere suggested Dillon's compositions reduced particulate emissions, *id.* at 691, but offered a motivation to make Dillon's compositions independent of that property. With Dillon's composition claims "not limited to that [unexpected] use," the compositions remained obvious. *Id.* at 692; *see also Tyco Healthcare Group v. Mutual Pharm. Co.*, 642 F.3d 1370, 1373 (Fed. Cir. 2011) (finding "unavailing" the assertion an "unclaimed property" could render composition claims nonobvious).

Appellants' suggestion motivation must center on corneal permeability is legally erroneous, *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007) ("neither the particular motivation nor the avowed purpose of the patentee controls"), and factually wrong, since Appellants and their expert admit independent reasons exist to use 0.01 w/v% EDTA to formulations, *e.g.*, as a preservative or discoloration agent. (OpnBr. at 26-27; A1792, A1797).

Appellants also misidentify the starting point for the *Graham* "differences" analysis. *See Galderma*, 737 F.3d at 737. Lupin need not prove an independent "motivation" to use 0.01 w/v% EDTA in the prior art compositions because the '456 patent *already* taught it. The starting point for the "differences" analysis asks

40

whether one of ordinary skill had motivation to use gatifloxacin in prior art fluoroquinolone formulations. The district court addressed that very question (A27), and found the requisite motivation. *See Bayer*, 575 F.3d at 1349.

***Summary***. The district court correctly found no differences between composition claims 12-16 and the combination of gatifloxacin and '456/'465 patents' ophthalmic formulations one of ordinary skill could make with a reasonable expectation of success.

However, even assuming corneal permeability was the only motivation to use 0.01 w/v% EDTA in a composition (it wasn't), the outcome of the obviousness analysis stands for the same reasons set forth for claim 6, as next discussed.

### b. There are no differences between method/process claim 6 given prior art EDTA teachings.

Reexamined claim 6 states:

6. A method for raising corneal permeability of an aqueous pharmaceutical Gatifloxacin eye drop solution *comprising Gatifloxacin or its salt*, having a pH of from above 5 to about 6 containing *from about 0.3 to about 0.8 w/v%* Gatifloxacin or its salt, which comprises incorporating *about 0.01 w/v%* disodium edetate into [eye drops containing Gatifloxacin or its salt] *said Gatifloxacin eye drop solution*.

(A47). Since the composition elements were known (Section V(A)(3)(a)), the issue is whether one of ordinary skill could reasonably expect such compositions to possess an increasing-corneal-permeability property from EDTA. They could. (A30-A31).

41

### i. Using EDTA to influence corneal permeability was known.

The district court invalidated original claim 6 in *Apotex* I, finding motivation by one of ordinary skill to prepare ophthalmic formulations containing gatifloxacin, in the pH 5-6 range, and using EDTA to raise corneal permeability. *Senju*, 717 F. Supp. 2d at 419-423. Senju never appealed those rulings. (*Id*.; *cf.* OpnBr. at 22). *Apotex* I specifically found the skilled person would have expected adding EDTA "even at a concentration as low as 0.1 w/v%" to "gatifloxacin eye drops would demonstrate an increased concentration of gatifloxacin in the aqueous humor." (A29-A30). Appellants are estopped from "redoing" such findings. (*See* Section V(B)(3)).

One of ordinary skill would have recognized "corneal permeability is a desirable property of an ophthalmic drug formulation," and "would have been motivated to use gatifloxacin and EDTA together." (A32). The Grass papers evaluated corneal permeability using a range of EDTA levels, including 0.5, 0.1, 0.05, and 0.01 w/v%. (A13, A30; OpnBr. at 8-9; *cf. id*. at 22).

With 0.01 w/v% EDTA in the corneal permeability context *already known* and tested in the prior art, *Galderma*'s analysis applies:

> [W]here there is a range disclosed in the prior art, and the claimed invention falls within that range, the burden of production falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and

42

unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations.

*Galderma*, 737 F. 3d at 738 (*citing Novo Nordisk*, 719 F.3d at 1352-54).

### ii. The district court found the prior art tested 0.01 w/v% EDTA to produce corneal permeability increases; Appellants fail to show that finding was clearly erroneous.

Appellants' theory the district court ignored their "teaching away" evidence hinges on the assumption Grass 1988 I taught one of ordinary skill that 0.01 w/v% EDTA produced zero corneal permeability. (OpnBr. at 9, 17, 22-23, 29-30, 37, 61). The district court acknowledged Appellants' contention, but rejected it. (A30-A31). Having lost that threshold finding, Appellants' "teaching away" arguments go nowhere.

### (A). Grass 1988 I and II; Rojanasakul.

The district court found the skilled person reading Grass 1988 I **would** reasonably expect 0.01 w/v% EDTA would work (A30, A32), specifically crediting Lupin's experts' testimony that the skilled person would recognize from the raw data in Grass 1988 I and other EDTA teachings that "the use of concentrations as low as 0.01 w/v% EDTA would be effective to increase corneal permeability." (A31; *see also* A1131). That finding deserves deference. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1334 (Fed. Cir. 2005) (credibility determinations are virtually never clear error); *TriMed, Inc. v. Stryker*

*Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2012) (what a reference teaches is a fact question).

Appellants argue *Ecolochem, Inc. v. S. Cal Edison Co.*, 227 F.3d 1361 (Fed. Cir. 2000) reveals the district court's Grass analysis erred. (OpnBr. at 28). *Ecolochem* found erroneous a district court's finding of "no evidence" of prior art concerns a particular process worked, despite several references actively criticizing such process. *Ecolochem*, 227 F.3d at 1379-80. Here, Appellants lack other references teaching 0.01 w/v% EDTA produces zero increase in polar drug permeability.

Appellants cite *Alcon Research Ltd. v. Apotex Inc.*, 687 F.3d 1362 (Fed. Cir. 2012) to argue "Grass 1985" did not "employ concentrations and conditions resembling those later specified" in the reexamined claims. (OpnBr. at 28). First, *Alcon* found obvious formulation claims within the prior art range tested; since Grass 1988 I tested 0.01 w/v% EDTA, *Alcon* supports invalidation. *Alcon*, 687 F.3d at 1368, 1370. Second, Appellants' theory (the skilled person lacked a reasonable expectation of success if changing EDTA levels by any order of magnitude) effectively concedes the '045 patent's specification—which likewise lacks such data—is defective to support or enable the claims. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 n.3 (Fed. Cir. 2008) (patentee arguing using a prior art method element was beyond the ability of the skilled person, when its

44

own patent "is itself silent regarding how to actually implement the methods claimed…might suggest that the claims present an enablement issue, rather than support a conclusion of nonobviousness").

Unlike *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983), where a district court combined two references in areas where the technologies and solutions clearly diverged (OpnBr. at 22), Appellants *lack* prior art stating 0.01 w/v% EDTA cannot increase corneal permeability of a polar drug. Grass 1985 taught his work applied to multiple ophthalmic formulations including "at lower concentrations".  (A2709-A2710).

Independently, the district court credited Rojanasakul's later-published data suggesting EDTA levels as low as 0.00037 w/v% would work, further supporting Grass 1988 I.  (A31).

**(B).  The district court considered Kompella and Mitra; neither reference "teaches away" from 0.01 w/v% EDTA.**

Appellants complain the district court did not properly consider Kompella and Mitra allegedly "teach away" from 0.01 w/v% EDTA, including because the opinion does not cite them.  (OpnBr. at 22-25, 28-29, 34, 36, 51-52).

The district court's opinion was not obligated to cite Kompella/Mitra. *MySpace, Inc. v. Graphon Corp.*, 672 F.3d 1250, 1263-64 (Fed. Cir. 2012); *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1343 (Fed. Cir. 2003)

45

("[t]he fact that the district court did not in its opinion recite every piece of evidence does not mean that the evidence was not considered"). The district court explained it "considered the documentary evidence and testimony" and the parties' post-trial briefing (A8), which discussed both references; Kompella/Mitra thus were presumptively considered. *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986).

### (1).  Kompella never teaches away.

Kompella used 0.5 w/v% EDTA in corneal permeability testing with beta-blockers, and *also* increased pH to improve corneal permeability.  (OpnBr. at 9, 23-24, 34, 36, 51, 54, 58).  Appellants argue such teachings "confirm that a skilled artisan would have expected the need for much higher EDTA concentrations and higher pH levels than the claimed values."  (*Id*. at 24, 36).  Appellants' theory is factually unsupported by any trial witness, and legally wrong.

Appellants' teaching-away pH argument is a new theory, and a false trail. Gatifloxacin cannot be formulated at Kompella's pH values without risking stability/decomposition.  (A1099, A1105-A1106).

As for EDTA, Kompella taught it was "not surprising" 0.5 w/v% EDTA increased corneal permeability of his series of polar molecules tenfold.  (A2811; A1516-A1517).  Lupin's expert explained that was "consistent with everything else that we've looked at through the prior art."  (A1517).  Even assuming

Kompella believed his particular EDTA and pH levels reflected the *best* chance to improve corneal permeability, it cannot "teach away" with a mere preference. *Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1376 (Fed. Cir. 2013). This is particularly so when the district court's claim construction lacks threshold permeability increases to achieve. (A15).

Unlike *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361-63 (Fed. Cir. 2011) (OpnBr. at 34), where prior art taught the disputed element failed as a stabilizer, Kompella says nothing derogatory about 0.01 w/v% EDTA or lower pH ranges. (A2811). Thus, Kompella cannot "teach away." *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1355-1356 (Fed. Cir. 2012); *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005)).

### (2). Mitra does not teach away.

Appellants admit Mitra did no EDTA testing. (OpnBr. at 9). Appellants otherwise utterly mischaracterize Mitra. (*Id*. at 9, 22-25, 52, 61). Mitra nowhere discourages investigation or dissuades the development of 0.01 w/v% EDTA formulations for polar drugs (A1518). *Galderma*, 737 F.3d at 739.

Mitra discussed Grass 1988 I and others on a cacophony of non-EDTA issues. (A1517, A1518, A1689). Appellants assert Mitra taught Grass warned "'[a]t 0.5%, EDTA was used to promote the transport of glycerol,' whereas '[i]n similar in vitro experiments at lower concentrations, 0.2 and 5.0 mM EDTA were

47

devoid of any effects.'" (OpnBr. at 9, 23, 52). The 0.2 and 5.0 mM concentrations *do not* refer to Grass's studies with EDTA and glycerol; they originate with a study using a probe molecule that never transported *even without EDTA*; thus adding EDTA could not relatively increase corneal permeability. (A1536-1537).

As Section III(A)(3)(b) above explains, Mitra accepted Grass's teachings the EDTA data suggested a concentration dependence. (A2772). Mitra describes the same mechanism for increasing corneal permeability as Grass and Rojanasakul. (*Id.*) Since the district court found that EDTA's ability to chelate calcium influences corneal permeability (A12)—the very mechanism Mitra recognized—Mitra fails to "teach away."

Nevertheless, "there is no rule that a single reference that teaches away will mandate a finding of nonobviousness." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). Mitra still concluded "an EDTA-drug combination does deserve some consideration in improving the bioavailability of poorly penetrating drugs…." (A2772; A1518). Since Mitra taught pursuing the very solution in dispute—without qualifying, "so long as it is above 0.01 w/v% EDTA"—Mitra cannot trump the Grass/Rojanasakul data the district court found persuasive. (A30-A31).

**(C).  The district court properly relied on Rojanasakul.**

Appellants attack Rojanasakul (OpnBr. at 32-34), but no trial witness supports Appellants' proffered theories on how to interpret the reference. Appellants' attorney argument should be disregarded.  *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068-1069 (Fed. Cir. 2005).

Appellants contend absent Rojanasakul testing gatifloxacin transport *in vivo*, Lupin cannot discharge its burden of proof.  (OpnBr. at 33).  Lupin's production burden did not mandate locating a reference where fully-anticipating compositions produced corneal permeability improvements.  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367 (Fed. Cir. 2007).  *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286 (Fed. Cir. 2006) permits showing a reasonable expectation of success through biological correlations, even if imperfect.  *Id*. at 1295.

Rojanasakul explains his prior work confirmed "changes in electrical resistance and capacitance ***correlate well*** with changes in the aqueous intercellular space and membrane surface integrity, respectively."  (A2795) (emphasis added). Thus, contrary to Appellants' argument (OpnBr. at 34), Rojanasakul's results are not limited to testing transport "into epithelial cells"; they "correlate well" with changes in the intercellular between-cell space.  (A1513).  Consequently, the district court properly found Rojanasakul independently supported the reasonableness of expecting 0.01 w/v% EDTA would work.  (A31).

49

**(D). The district court rightly disregarded Appellants' untimely size-dependent theory.**

Contrary to Appellants' assertions (OpnBr. at 38), their "size dependent" argument was "drawn from thin air" at trial. (A33-A34 n.35).

The district court did not run afoul of *Meyer Intellectual Properties, Ltd. v. Bodum, Inc.*, 690 F.3d 1354 (Fed. Cir. 2012). There, prior art was excluded wholesale, despite its citation in another's expert report and interrogatories. *Id.* at 1373-74. Appellants here *nowhere* comparably alleged gatifloxacin's size precluded movement through EDTA-created intercellular spaces; Appellants' citations to Dr. Stella's expert reports and deposition (OpnBr. at 37-38) do not show otherwise. Appellants cannot argue the issue was "fairly litigated" by citing its own witness; testimony Appellants solicited on cross-examination; and Dr. Stella's testimony given subject to later resolution of Lupin's objection. (OpnBr. at 38 n.5).

Lupin timely objected to Dr. Stella's testimony (*e.g.*, A1782, A1784); the district court allowed Appellants to present the theory but held admissibility would be decided post-trial (A1351, A1353-A1354). Lupin explained Appellants' new theory violated the court's scheduling orders, and prejudiced Lupin. (A4139-A4140). The district court found the theory untimely. (A33 n.35). Appellants show no abuse of discretion for this scheduling order sanction. *See Trilogy*

*Commc'ns Inc. v. Times Fiber Commc'ns Inc.,* 109 F.3d 739, 745 (Fed. Cir. 1997) (prejudice can result from scheduling order violations); *United States v. 68.94 Acres of Land*, 918 F.2d 389, 396 (3d Cir. 1990) (expert witness exclusion can be "an appropriate sanction for a party's violation of a discovery order or some other pre-trial order"). Appellants cite *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285 (Fed. Cir. 2012). There, the expert's testimony was improperly excluded on lack-of-qualifications grounds, not timeliness. *Id.* at 1297.

Appellants' pages of argument further lack witness support aside from confirmation that certain prior art molecules have certain molecular weights. (OpnBr. at 35-37). The Grass papers specifically considered whether a molecule's size dictated whether EDTA would enhance its permeability, and at least for molecules the size of gatifloxacin, the answer is "no." (*See* Section III(A)(3)(a)). There is no relationship between size (molecular weight) and the effects of EDTA on corneal permeability, as Dr. Grass testified. (A1547-A1548; *see also* A1530).

Appellants also stretch (OpnBr. at 23-24, 36-37) and *assume* that Kompella must have thought (but never published) he needed 0.5 w/v% EDTA because otherwise, he couldn't create a big enough intracellular space to push through "around 300 dalton" beta-blocker molecules. Appellants' speculation regarding Kompella's state of mind or privately-held unpublished thoughts cannot "teach away," and should be disregarded. *Invitrogen*, 429 F.3d at 1068. Since

51

Appellants' proffered cites (OpnBr. at 36-37, 38 n.5; A2811 A1692-A1693, A1514-A1515, A1701-A1702) nowhere bless Appellants' new theory that gatifloxacin's size relative to glycerol might mean 0.01 w/v% EDTA wouldn't work, there was no error.

Appellants contend the concept that "larger objects generally cannot pass through smaller apertures" is "easily understandable." (OpnBr. at 38-39). Dr. Grass expressly disagreed with Appellants' theory, with actual prior art data to back his opinions up from his published work. (A1547-A1548). Appellants' Dr. Stella conceded the Grass papers taught EDTA helped increase cromolyn's permeability, with a molecular weight that well exceeded gatifloxacin's. (A1816, A1822; *see* A1812 (proteins between cells have several hundred thousand molecular weight—well exceeding gatifloxacin's)).

*Summary*. The district court correctly found it would have been reasonable for one of ordinary skill to expect 0.01 w/v% EDTA could increase corneal permeability in a gatifloxacin formulation. Appellants' size theory was untimely and unsupported. There is no error here.

Thus, since Grass and other references taught EDTA in ophthalmic formulations would increase permeability (even if used, *e.g.*, as a preservative and at lower concentrations than the ones Grass tested); and one of ordinary skill would have reasonably expected from the Grass papers' teachings using EDTA (including

at levels as low as 0.01 w/v%) would also provide the companion benefit of enhancing corneal permeability (and if there was any doubt, Rojanasakul's work taught even lower levels should work); the district court correctly found one of ordinary skill in the art would have had a motivation to combine the prior art teachings to reach the compositions claimed, and reasonably expect the 0.01 w/v% EDTA would increase corneal permeability. (A30-A31). As with claims 12-16, there are no differences between the prior art combinations and what is encompassed by claim 6; there is no teaching away.

However, the district court did not end there to find claim 6 obvious. Contrary to Appellants' allegation (OpnBr. at 43), *before* reaching its obviousness conclusion, the district court evaluated Appellants' so-called unexpected results evidence, and likewise found it lacking. (A32-A33).

> ### c. The district court correctly found Appellants' "unexpected results" evidence unpersuasive before reaching the ultimate conclusion on obviousness.

Appellants argue the district court's conclusion Defendants "met their burden" to demonstrate obviousness equates to the ultimate obviousness finding. (OpnBr. at 44-45, referencing A32). Noting Defendants met their initial *burden* merely recognizes the procedural advantage patentees receive, where the challenger must first "come forward with evidence of nonobviousness," before the patentee has the burden of *production* on secondary considerations "only after the

53

challenger has successfully made his prima facie case demonstrating that the patent might be obvious." *Novo Nordisk*, 719 F.3d at 1353. That is a key distinction with, *e.g.*, *Apple Inc. v. ITC*, 725 F.3d 1356, 1365 (Fed. Cir. 2013) (*patent adjudged obvious before reviewing secondary considerations*) and *In re Cyclobenzaprine*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (shifting burden of *persuasion* to patentee).

Since the district court did not actually find the claims obvious until after considering Appellants' alleged teaching away/unexpected results evidence (A34), no procedural; burden-shifting; or hindsight error exists. Nor does the substance of the evidence justify finding non-obviousness.

> **i.    Senju's results were not statistically significant; reported numerical increases were unsurprising after Grass 1988 I.**

Appellants argue their '901 and '904 studies reflect unexpected results. (OpnBr. at 45-54). Both studies generated unusually large error bar increases Appellants repeatedly refused to explain. (A33 n.34).

In the '901 study, Senju "administered the formulation not once but three times" using a procedure Grass in 1985 explained could artificially elevate permeability results. (A1523-A1524; OpnBr. at 46). While the 0.01 w/v% EDTA levels increased numerically by 27%, on the whole they were statistically insignificant compared to the control. (A1215). Though one data point (at the 30

54

minute mark) showed a statistically significant difference, several data points showed little significance versus the no-EDTA formulations. (A1738-A1739). No statistically different improvements were seen overall, or for any other time period, as Appellants' own statistician admitted. (A1215; *see also* A1740).

No time point in the '904 study, with a single 0.01 w/v% EDTA dose, showed statistically significant improvements, despite observed numerical increases. (A1725-A1726, A1740). Some EDTA formulations performed worse compared to no-EDTA formulations. (A1727-A1728).

Senju's results are expected from Grass 1988 I—overall, a numerically measurable increase is observed, but it is not statistically significant. (A2780-A2781). Appellants incorrectly claim no dispute that the numerical increases were "substantial" (OpnBr. at 48); the irregular error bar size alone calls that into question. (A33 n.34).

Appellants argue statistical significance is not required for patentability. (OpnBr. at 48). But the PTO allowed the claims *because* Appellants' Dr. Mayo represented Grass 1988 I's 0.01 w/v% EDTA results were not statistically significant, while Senju's 0.01 w/v% EDTA/gatifloxacin combination was (A2639-A2643, A2683)—a representation Dr. Mayo backtracked from at trial ('901 study, A1215); which Dr. Bloch disproved (A1740); and which the district court resolved in Defendants' favor (A33).

55

Nor do the Senju studies show increases that "far outstrips the additive total of 'expected' effectiveness." *In re Kollman*, 595 F.2d 48, 56-57 (C.C.P.A. 1979). Appellants argue Dr. Grass admitted the '901 study showed statistically significant results. (OpnBr. at 56 (citing A1560-A1562)). All Dr. Grass acknowledged is that the Senju '901 study reports a single time point—at 30 minutes—that the study claimed was statistically significant. (A1561-A1562). Lupin's statistician demonstrated this time point was statistically *insignificant* under a correct analysis, with results no better than random. (A1738-A1740).

Even so, not even the triple-dosing '901 study showed statistical significance at the 20 minute mark, when Grass 1988 I's 0.01 w/v% EDTA solutions were tested as single doses.[7] Grass published an established concentration and time dependence where the 30 minutes' permeability numbers quadrupled or more the 20 minute permeability numbers. (A1499-A1500, A1539-A1540). Thus, Senju's studies achieved nothing better than Grass 1988 I. (A1499, A2756, A2766, A2781). Nor did the district court construe the claims as limited to an "unexpected" effectiveness level. (A15).

Moreover, Dr. Stella's unexpected results opinion was premised on the "expectation" one of ordinary skill would get zero corneal permeability increase

---

[7] Appellants were obliged to compare to the closest prior art (OpnBr. at 49), but *failed* to produce evidence the Senju 0.01 w/v% EDTA studies outperformed Grass 1988 I in a true head-to-head comparison at the 20 minute mark.

with 0.01 w/v% EDTA. (OpnBr. at 49; A1785-A1786). The district court found one of ordinary skill *expected* a non-zero increase from the Grass 1988 I data with 0.01 w/v% EDTA. (A30-32). Appellants' attorney argument one of ordinary skill required "visible expansion of intercellular spaces" to believe corneal permeability would exist was expressly refuted by Dr. Grass. (A1511).

Thus, the Senju studies fail to support "unexpected results."

### ii. The district court correctly found the magnitude of increase was unpersuasive.

Numerical improvements alone do not constitute unexpected results. *See Merck & Co., Inc. v. Biocraft*, 874 F.2d 804, 808 (Fed. Cir. 1989) ("medically synergistic" result "convinced the examiner, but it should not have," because it was "normal" to see improvements when combining two compounds). Here, it was "normal" to expect an EDTA/polar drug combination would generate some increase in corneal permeability. (A30; *cf.* OpnBr. at 54 (citing A32)).

Nor can an unexpected magnitude of increases from a combination justify a patent if one of ordinary skill in the art would have prepared the combination anyway. *Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476 (Fed. Cir. 1997); *Pfizer*, 480 F.3d at 1372; *In re Mod*, 408 F.2d 1055, 1056 (C.C.P.A. 1969); *see also Bayer Healthcare*, 713 F.3d at 1377 (unexpected results evidence may be "legally insufficient" to show nonobviousness).

Appellants assert the district court inconsistently "criticized" Dr. Stella for relying on the raw data while accepting the Grass 1988 I raw data for prior art purposes. (OpnBr. at 55). Appellants have it backwards—the district court pointed out the propriety of considering Grass's raw data, not merely the statistical significance notation "0" Appellants emphasized, precisely because Dr. Stella himself relied on statistically insignificant raw data to urge unexpected results. (A30; A1809-A1810).

Appellants assert the district court "found" the Senju studies demonstrated the "gatifloxacin concentrations" were "significantly higher for the solution containing EDTA." (OpnBr. at 14-15 (citing A20)). On that page, the district court merely summarized *Appellants' contention* about what the studies showed. (A19-A20). Its ultimate finding never endorsed the premise the studies showed a significant increase. (A21 ("the court finds,…there is support for the proposition" that [Senju's test] "shows an increase in corneal permeability")). The district court *questioned* the accuracy of the magnitudes due to the large and unexplained error bars. (A33 n.34). Thus, the Senju study results do not "compel[] a judgment for Appellants on nonobviousness." (OpnBr. at 55).

Appellants criticize the district court's observation that modifying the pH from 7 to 6 produced a 30% corneal permeability change. (OpnBr. at 57-58). Appellants entirely miss the district court's point. If a mere pH adjustment of one

58

unit can produce a 30% difference in corneal permeability, and pH adjustments are routinely done (indeed, Appellants' claims permit a one unit pH range of above 5 to about 6), Appellants' 27-40% change in corneal permeability with 0.01 w/v% EDTA has a magnitude achievable by other formulation tweaks and routine practice.  (A33-A34; A1483, A1486).

Appellants wrongly claim the district court used the '045 patent as a "roadmap." (OpnBr. at 58).  The district court explained the prior art (without the '045 patent specification) *already taught* one to expect a continuum of corneal permeability that increased or decreased along with increased/decreased EDTA levels generally.  (A31-A32).  Gatifloxacin+EDTA did not deviate from this established trend, because Appellants' own data showed increasing the EDTA levels from 0.01 to 0.05 w/v% produced numerical corneal permeability increases (from 27-40% to 67%).  (A41 at Table 2 (Formulation B, without EDTA, 1.30µg/ml ÷ Formulation C, with EDTA, 1.93 µg/ml=~67%)).  The district court merely confirmed gatifloxacin adhered to the general expectation the art already possessed; thus, Appellants' cited cases (OpnBr. at 58) are inapplicable.

Further, the district court's claim construction does *not* require achieving "significant" or any other threshold level of permeability increases.  (A15).  Even if Appellants possessed one particular formulation that, when triple-dosed in rabbits, produced one significant 30-minute result, since the claims remain "broad

enough to read on obvious subject matter" (including statistically *insignificant* single doses) they remain unpatentable. *Muniauction,* 532 F.3d at 1328 n.4.

Finally, Lupin was not required to prove a reasonable expectation of success by showing one of ordinary skill could perfectly predict exactly how a gatifloxacin formulation would perform under the exact conditions of use. *Alza*, 464 F.3d at 1295. Like *Alcon*, 687 F.3d at 1369, even though the prior art does not "expressly disclose" how 0.01 w/v% EDTA+gatifloxacin will work in aqueous humor, "neither does the ['045] patent." *Id*. at 1369. Thus, if "a skilled artisan would be able to practice the invention claimed in the ['045] patent despite its lack of explicit instruction...the artisan would have a reasonable expectation of success for adapting" prior art 0.01 w/v% EDTA formulations and gatifloxacin "for the same use in a [rabbit or] human eye." *Id*. Consequently, if Appellants seriously contend one of ordinary skill requires test data to reasonably expect 0.01 w/v% EDTA works, then Appellants' own specification fails under 35 U.S.C. § 112. (*See* Section V(B)(2)).

***Summary***. The district court correctly found a prior art reason to pursue 0.01 w/v% EDTA for corneal permeability; the art *did not* teach away from that level by telling one of ordinary skill the 0.01 w/v% EDTA levels were inoperative; and the raw data numbers Senju eventually achieved in its own gatifloxacin/0.01 w/v% EDTA tests were, like the Grass 1988 I results, not statistically significant at

the 20 minute mark, and had an order of magnitude comparable to that achievable via other routine formulation modifications. (A33). The district court thus correctly concluded, after considering Appellants' so-called secondary considerations evidence, claim 6 was obvious.

## B. Alternative grounds for affirmance.

Appellants have repeatedly asserted the '045 patent; Lupin's counterclaims encompass noninfringement; invalidity generally; collateral estoppel; and intervening rights, giving this Court jurisdiction to review alternative grounds for affirmance. *See Glaxo Group Ltd. v. TorPharm, Inc.,* 153 F.3d 1366, 1372 (Fed. Cir. 1998); *Broadcast Innovation, LLC v. Charter Commc'ns, Inc.*, 420 F.3d 1364, 1366-1367 (Fed. Cir. 2005) (appellate courts may address arguments beyond the district court's opinion where the issue presents significant questions of general impact or of great public concern, including impacting a large number of patents or causes of action).

### 1. In Hatch-Waxman cases, the ANDA product and label is paramount.

In Hatch-Waxman cases, the relevant infringement inquiry emphasizes the ANDA documents. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1567 (Fed. Cir. 1997); *Bayer AG*, 212 F.3d at 1248-49. When the ANDA directly addresses the infringement question, summary judgment is appropriate. *Id*. at 1249-1250.

61

a. **The district court's claim 6 direct infringement analysis employed an "analogous product" claim comparison.**

Lupin's ANDA products are intended for human use only. The district court acknowledged Appellants lacked evidence increased gatifloxacin corneal permeability actually resulted from the 0.01 w/v% EDTA found in Lupin's ANDA products. (A19). The district court excused this failure by reasoning Appellants' test data from *different* formulations on rabbit eyes was "probative" of infringement (A19), citing *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 (Fed. Cir. 2009). In *Martek*, while the patentee did not run comparative tests on the accused product, the infringement comparison nevertheless still compared the *accused product* to the claims. *Id*. at 1372-1373.

*Martek* cites *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1312 (Fed. Cir. 2001). In *Forest*, Abbott argued presenting water level evidence was unnecessary because the accused product would eventually become hydrated. *Id*. at 1311. This is analogous to the district court's assumption Appellants could prove infringement of Defendants' products by testing *different* formulations that lacked the corneal permeability enhancer BAK found in Defendants' ANDA products. (A20). That was error; just as Abbott failed to meet its burden of proof, because "Abbott cannot escape the need to present evidence consistent with the strictures of the claims…," *id*. at 1312, so too here Appellants could not meet their

burden of production or proof with testing only on products that *differed* from Lupin's ANDA products.

### b. The district court improperly skipped the claim 6 inducement-to-infringe analysis.

For method claims in Hatch-Waxman litigation, patentees can only pursue indirect infringement claims against a generic manufacturer. *Warner-Lambert*, 316 F.3d at 1353. Hatch-Waxman infringement of method claims under 35 U.S.C. § 271(e)(2) pertain to ANDA products claimed in a patent "or *the use of which* is claimed in a patent," with "the use" defined to mean, "the use listed in the ANDA." *AstraZeneca Pharm., L.P. v. Apotex* Corp., 669 F.3d 1370, 1378 (Fed. Cir. 2012). The only relevant uses are those listed in the ANDA for which the ANDA applicant is seeking FDA approval, namely FDA-approved uses. *Id.* at 1379-1380; *see also Warner-Lambert*, 316 F.3d at 1365-1366 (off-label uses cannot invoke inducement-to-infringe liability).

The district court "declined to entertain defendants' defense that their products do not infringe because they are not seeking to use them to 'raise corneal permeability'" under the theory that this was an issue that required vetting in discovery. (A24 n. 25). That was legal error; as *AstraZeneca* noted, when a label instruction to a claimed method is absent from a proposed ANDA product, the issue is amenable to resolution even on a motion to dismiss. *AstraZeneca*, 669 F.3d at 1376-1377. Lupin's label includes only the following FDA indication:

> Gatifloxacin ophthalmic solution, 0.5% is a topical fluoroquinolone anti-
> infective indicated for the treatment of bacterial conjunctivitis caused by
> susceptible strains of the following organisms: [names omitted].

(A4749; *see also* A5148). The dosing instructions say nothing about enhancing permeability. (A4749; *see also* A5151).

Appellants had the burden to find text in Lupin's ANDA labeling seeking FDA approval of increased corneal permeability uses with EDTA, and proffered none.

The district court's refusal to recognize the importance of the proposed labeling likewise infected its claim 6 analysis under 35 U.S.C. § 271(a) and (g). The district court deemed claim 6 infringed since Lupin would import its product. (A24). That analysis ignores the claim 6 corneal-permeability method elements.

Thus, since it is undisputed Lupin will not itself use the products it manufactures in the U.S. (A24); and Appellants failed to proffer any evidence that Lupin demonstrated the requisite specific intent to induce infringement via the label indications Lupin sought in its ANDA; and the labeling nowhere references enhancing corneal permeability with EDTA, the district court's claim 6 infringement judgment should be reversed.

*Finally*, Appellants argue both method/process claim 6 and composition claims 12-16 are patentable for achieving "unexpected" gatifloxacin permeability increases. (OpnBr. at 16, 17-18, 40, 43-45, 49-50, 53-54, 64-66). Claims must be

similarly construed for validity/infringement. *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1317-1318 (Fed. Cir. 2009). If Appellants' "unexpected results" theory preserves the claims, the district court's infringement analysis must be vacated to evaluate whether Defendants' products achieve such results.

> ## 2. Under Appellants' logic, the asserted claims are invalid under 35 U.S.C. § 112.

If the asserted claims are not invalid for obviousness, they remain invalid under 35 U.S.C. § 112 because the '045 patent specification itself fails to cure the very deficiencies Appellants charge of the prior art.

> ### a. The '045 patent nowhere states 0.01 w/v% EDTA increases corneal permeability.

The '045 patent purportedly covered three inventions, only one of which involved corneal permeability. (*See* Section III(B)(1)). The '045 patent specification characterizes the corneal permeability invention as showing an EDTA formulation with "1/10" the EDTA levels of the "normally" used 0.5 w/v% EDTA (*i.e.*, 0.05 w.v% EDTA) produced permeability increases. (A41). Named inventor Yasueda admitted his specification did not teach that "1/50th" of the "normal" level (*i.e.*, 0.01 w/v% EDTA) generated a corneal permeability improvement, nor could he—it wasn't until years *after* filing the '045 patent that Senju first ran the '901 and '904 corneal permeability studies. (A1153, A2748, A2758). Even then,

Senju only evaluated the impact of EDTA on corneal permeability after adding EDTA to the formulations to prevent discoloration. (A2749, A2759).

Appellants acknowledge that what inspired claims restricted to 0.01 w/v% EDTA was the hindsight advantage of having the district court's invalidity findings in-hand. (OpnBr. at 11-12). The specification sections Appellants argued gave written description support for their claims nowhere mention using 0.01 w/v% EDTA to enhance corneal permeability. (A2095, A2635, A2644-A2647).

Appellants insist one of ordinary skill in the art would have been dissuaded from pursuing 0.01 w/v% EDTA because the prior art taught corneal permeability at this level was zero, *i.e.,* inoperative, and because there was no corneal permeability *in vivo* test data with 0.01 w/v% EDTA. (OpnBr. at 23, 24, 30-31, 37, 50-52). Since the '045 patent lacks non-zero 0.01 w/v% *in vivo* test data, by Appellants' logic, one of ordinary skill even with the '045 patent's specification would disbelieve 0.01 w/v% EDTA increases corneal permeability.

### b. Appellants cannot denigrate the prior art teachings without invalidating their own patent.

Specifiations must contain both a written description and enabling disclosure. 35 U.S.C. § 112, ¶ 1 (2013). Section 112 protects the public by enforcing the *quid pro quo* of the patent monopoly: ensuring the inventor possessed the invention claimed (written description), **and** substantively disclosed more than a mere hypothesis (enablement). *AK Steel Corp. v. Sollac & Ugine*, 344

F.3d 1234, 1244 (Fed. Cir. 2003); *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1324 (Fed. Cir. 2009).

###### i. There is no written description support for the 0.01 w/v% EDTA in a corneal permeability method.

Written description is an "objective inquiry," *Ariad Pharm., Inc. v. Eli Lily & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010), to ensure the patentee possessed the claimed invention at the time of application, *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005), and is not overreaching with later invention assertions. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003); *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1327 (Fed. Cir. 2000).

Under Appellants' theory of the case on appeal—that one skilled in the art required 0.01 w/v% EDTA test data *in vivo* to believe such EDTA levels increased corneal permeability, and the prior art lacked such evidence—then the '045 patent itself necessarily lacks written description support for a 0.01 w/v% EDTA solution to enhance corneal permeability. Yasueda admitted his specification lacked teachings recommending 0.01 w/v% EDTA to increase corneal permeability. (A1153). Appellants' corneal-permeability work with 0.01 w/v% EDTA occurred years after filing. (A2748, A2758).

Nor does the specification contain "blaze marks" explaining *why* one should select 0.01 w/v% EDTA for corneal permeability but not the actually-tested formulations. *See In re Ruschig*, 379 F.2d 990, 994-95 (C.C.P.A. 1967); *Purdue*, 230 F.3d at 1326-27; *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1367-68 (Fed. Cir. 2011) ("the lack of such blaze marks" in the patent showed a lack of sufficient written description "of the claimed sub-genus."); *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013) (working backwards from the claims "by hindsight" from "an amalgam of disclosures plucked selectively" from the specification was improper to show written description).

Thus, if as Appellants argue, the prior art fails to direct one of ordinary skill towards 0.01 w/v% EDTA in a corneal permeability method, since the inventor never envisioned it and the '045 patent lacks any disclosure recommending using such amounts to increase corneal permeability, the asserted claims are invalid for lack of written description.

> ## ii. The '045 patent does not even hypothesize 0.01 w/v% EDTA will work to increase corneal permeability.

Enablement is a question of law reviewed without deference based on underlying factual inquiries. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1370 (Fed. Cir. 2013); *Wyeth and Cordis Corp. v. Abbott Labs.*, 720 F.3d

1380, 1384-1386 (Fed. Cir. 2013). Because enablement requires how-to-use proof—a standard higher than reasonable expectation of success—"[t]ypically, patent applications claiming new methods of treatment are supported by test results." *In re '318 Patent Infringement Litig.*, 583 F.3d at 1324. Non-enabling disclosures result from "a complete absence of data" supporting the desired method outcome, *Rasmusson v. Smithkline Beecham Corp.*, 413 F.3d 1318, 1323 (Fed. Cir. 2005), because "a patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion." *Brenner v. Manson*, 383 U.S. 519, 536 (1966). Nor is it enough for a patentee to merely show "that it is 'not implausible' that the invention will work for its intended purpose." *Rasmusson*, 413 F.3d at 1325. One cannot patent "respectable guesses" or "propos[e] an unproved hypothesis." *Id.*

Appellants insist one of ordinary skill would have viewed the prior art as teaching 0.01 w/v% EDTA would not work, particularly without *in vivo* data. (OpnBr. at 23, 24, 30-31, 37, 50-52). Inventor Yasueda and Appellants' expert admitted the specification of the '045 patent lacks such data. (A1152; A1803-1804). Experiment 1 (the only experiment pertaining to corneal permeability) never tested 0.01 w/v% EDTA. (A41, A1143-1144, A1153). Dr. Sherman confirmed the '045 patent gave no assurances to one of ordinary skill that 0.01 w/v% EDTA increases corneal permeability or gatifloxacin concentration in the

aqueous humor (A1844); such assurance could only originate with prior art teachings (A1655-A1656). Thus, the '045 patent here (given Appellants' arguments and admissions) is analogous to the non-enabling specification in *In re '318 Patent Infringement Litig.*, 583 F.3d at 1327 (inventor's testimony used to prove an ordinarily skilled artisan would not have found patent's disclosure enabling). *See also Muniauction,* 532 F.3d at 1327 n.3.

### 3.  Collateral estoppel precludes Appellants' claims.

The district court declined to reconsider whether its factfindings warranted dismissal for collateral estoppel. (A7). Collateral estoppel applies under both *Apotex* I and II. Absent affirmance, this Court should consider the issue (or remand to the district court for consideration).

Whether collateral estoppel applies is a legal question. *Szehinskyj v. Att'y Gen. of the United States*, 432 F.3d 253, 255 (3d Cir. 2005). Having fully litigated in *Apotex* I the facts and legal (not merely patent) claims under the '045 patent, Appellants are estopped from relitigating such facts and claims. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333-34 (1971); *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 713 (Fed. Cir. 1983); *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1380 (Fed. Cir. 1999).

The district court denied Lupin's motion to dismiss for collateral estoppel based on Appellants' arguments that incorporating 0.01 w/v% EDTA made a

difference to the reexamined claims scope. It should not have; Appellants *chose* to pursue only broad claims when suing Apotex. Senju could have sought reexamination of the '045 patent before suing Apotex. *See* 35 U.S.C. § 302. And, if a narrower scope wasn't then-envisioned, that supports finding Section 112 invalidity. Reexamination is not intended to permit serial lawsuits on the same disclosed subject matter to seek a judicial scrutiny-surviving claim.

The identity of issues and claim language determines whether collateral estoppel applies. *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013). Since corneal permeability and claims with EDTA ranges construed to include 0.01 w/v% EDTA were at issue in *Apotex* I; the specification was unchanged; and the district court rejected Appellants' efforts to pursue the reexamined claims against Apotex in *Apotex* II, collateral estoppel prevents Appellants from pursuing the reexamined claims against Lupin as well.

### 4.    Lupin should receive intervening rights.

The district court did not decide intervening rights. (A35-A36). Below, Lupin met the statutory requirements for intervening rights under 35 U.S.C. §§ 252 and 307(b) because Senju changed the scope of their claims during reexamination. (A46-A47). This claim change is central to Appellants' appeal.

The equitable factors weigh decidedly in favor of intervening rights; Lupin's decision to subject itself to Hatch-Waxman litigation risks via a Paragraph IV

certification occurred as a consequence of the district court's *Apotex* I invalidity decision.   (A1756-A1757).   At trial, Lupin introduced testimony and documents (including the ANDAs) showing substantial investments in the millions.   (A6375-A6376).   The reexamined claims issued in the midst of the litigation below.   *Senju*, 891 F. Supp. 2d at 658.   Equity simply does not permit Appellants to attack Lupin with its reexamined claims, especially when both Defendants relied on the *Apotex* I ruling invalidating the '045 patent with the expectation their products, when developed and marketed, would not infringe any valid patent.   Thus, if the district court's judgment is not affirmed, Lupin should be awarded intervening rights.

## VI.    CONCLUSION

Defendants respectfully request the district court's entry of judgment be affirmed.

Dated: January 27, 2014

 /s/Deanne M. Mazzochi
William A. Rakoczy
Paul J. Molino
Deanne M. Mazzochi
Anuj K. Wadhwa
John D. Polivick
Brian P. Murray
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
Telephone:  312-527-2157
Email:  wrakoczy@rmmslegal.com
Email:  paul@rmmslegal.com
Email:  dmazzochi@rmmslegal.com
Email:  awadhwa@rmmslegal.com
Email:  jpolivick@rmmslegal.com
Email:  bmurrary@rmmslegal.com


*Attorneys for Defendants-Appellees*
*Lupin Limited and Lupin Pharmaceuticals, Inc.*

# United States Court of Appeals
## for the Federal Circuit

SENJU PHARMACEUTICAL CO. V. LUPIN LIMITED, 2013-1630

## CERTIFICATE OF SERVICE

I, Natasha Johnson, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by RAKOCZY MOLINO MAZZOCHI SIWIK LLP, Attorneys for Defendants-Appellees to print this document. I am an employee of Counsel Press.

On **January 27, 2014**, Counsel for Defendants-Appellees has authorized me to electronically file the foregoing **Brief of Defendants-Appellees Lupin Limited and Lupin Pharmaceuticals, Inc.** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Richard D. Kelly
Stephen G. Baxter
Frank J. West
OBLON, SPIVAK, MCCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke Street
Alexandria, Virginia 22314
(703) 413-3000 (telephone)
(703) 413-2220 (facsimile)

Mark Andrew Perry
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500 (telephone)
(202) 467-0539 (facsimile)

Jeffrey T. Thomas
GIBSON, DUNN &
CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612
(949) 451-3967 (telephone)
(949) 475-4670 (facsimile)

*Counsel for Plaintiffs-Appellants Senju
Pharmaceutical Co., Ltd., Kyorin
Pharmaceutical Co., Ltd. and Allergan,
Inc.*

Karen E. Keller
Jeffrey T. Castellano
SHAW KELLER LLP
300 Delaware Avenue
Suite 1120
Wilmington, DE 19801
(302) 298-0700 (telephone)
(302) 300-4026 (facsimile)

Stephen D. Roth
HI-TECH PHARMACAL CO.,
INC.
369 Bayview Avenue
Amityville, NY 11701
(631) 789-8228 (telephone)
(631) 881-9216 (facsimile)

*Counsel for Defendant-Appellee Hi-Tech
Pharmacal Co., Inc.*

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

January 27, 2014                                    /s/ Natasha Johnson
                                                             Counsel Press

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7()B).   This brief contains 13,746 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).   Microsoft Word 2010 was used to calculate the word count.

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).   This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.


/s/Deanne M. Mazzochi
Deanne M. Mazzochi